1  Kristin L. Martin, SBN 206528
2  Kimberley C. Weber, SBN 302894
   McCRACKEN, STEMERMAN & HOLSBERRY, LLP
3  595 Market Street, Suite 800
4  San Francisco, CA 94105
   Telephone: 415-597-7200
5  Fax: 415-597-7201
6  E-mail: klm@msh.law
            kweber@msh.law
7
8  *Attorneys for UNITE HERE Local 11*

9
10                **UNITED STATES DISTRICT COURT**
11               **CENTRAL DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| HOST INTERNATIONAL, INC., | Case No.: 19-cv-1568 |
| Petitioner, | [Assigned For All Purposes to Honorable Magistrate Judge Suzanne H. Segal] |
| vs. | |
| UNITE HERE Local 11, | **DECLARATION OF KRISTIN L. MARTIN IN SUPPORT OF MOTION TO CONFIRM ARBITRATION AWARD AND IN OPPOSITION TO PETITIONER HOST INTERNATIONAL, INC.'S MOTION TO VACATE** |
| Respondent. | |
| UNITE HERE Local 11, | Date:        April 23, 2019 |
| Counterclaimant, | Time:        10:00 a.m. |
| vs. | Dept.:       Courtroom 590 |
| HOST INTERNATIONAL, INC., | Petition Filed: March 4, 2019 |
| Counterdefendant. | |

1

I, Kristin L. Martin, declare:

1.  I am a partner with the law firm of McCracken, Stemerman & Holsberry, LLP. I am counsel for Respondent and Counterclaimant UNITE HERE Local 11 ("Local 11") in this matter.  I have personal knowledge of the following facts and if called as a witness, could and would testify competently thereto.

2.  I represented Local 11 in the arbitration proceeding between Local 11 and Host that resulted in the arbitration award is the subject of this case.

3.  Larry Stone and Stephen Zimmerman are counsel for Petitioner Host International, Inc. ("Host") in this matter.  My understanding is that Mr. Stone is Host's lead counsel, and that Mr. Zimmerman is his associate.

4.  Host's Notice of Motion and Motion to Vacate the Arbitration Award states that counsel conferred on February 9, 2019 and March 1, 2019.  That is false.  Until this case was filed, I was Local 11's sole counsel in this matter, and I did not speak with Mr. Stone or Mr. Zimmerman or any other counsel for Host on either of those dates about the substance of Host's motion.  The first time I spoke with either of them after the arbitration award was issued was on March 12, 2019 when I spoke with Mr. Stone.

5.  On March 12, 2019, I spoke with Mr. Stone by telephone about the petition and motion to vacate the arbitration award that Host filed on March 4 and 5, 2019.  I informed Mr. Stone that I intended to oppose the motion to vacate and file a counterclaim and motion to confirm the arbitration award.  We dismissed the substance of Host's motion and of Local 11's contemplated claim and motion which are related, and potential resolution of both, but did not resolve the matter.

6.  Local 11 and Host selected Arbitrator Guy Prihar (the "Arbitrator") to arbitrate the Grievance from a list of arbitrators suggested by Mr. Stone.

7.  Local 11 and Host held five days of hearing before the Arbitrator between February 27, 2018 and August 24, 2018, inclusive, at which each was represented by counsel and presented evidence.  After the hearing ended, Mr. Stone and I each submitted briefs.

DECLARATION OF KRISTIN L. MARTIN                    Case No.: 19-cv-1568

8.  At the first day of the hearing, Mr. Stone and I, as counsel for Host and Local 11 respectively, each identified the issues that our clients wanted the Arbitrator to decide and stipulated to give the Arbitrator authority to frame the issues for his decision.  True and correct copies of the relevant pages of the hearing transcript are attached hereto as **Exhibit 1.**

9.  Local 11 asked the Arbitrator to decide the following issues:

> Did the Employer violate Article 2 of the Collective Bargaining Agreement by failing to provide, assist in the completion of, and/ or remit union membership applications and dues deduction authorizations to the Union?  If so, what is the appropriate remedy?

> Did the Employer violate Article 2 of the Collective Bargaining Agreement by failing to deduct union initiation fees and/or monthly dues from employees' earnings?  If so, what is the appropriate remedy?

In its post-hearing brief to the Arbitrator, Local 11 addressed these issues and the issues identified by Host.  A true and correct copy of Local 11's post-hearing brief with the names of Host employees redacted to protect their privacy is attached hereto as **Exhibit 2.**  It is also attached as Exhibit C to Local 11's Answer and Counterclaim filed in this matter (ECF Doc. No. 12).

10.  Host asked the Arbitrator to decide the following issues:

> Is the language of Article 2.12 unlawful?

> Was the Collective Bargaining Agreement violated with respect to the failure to deduct dues and initiation fees for the employees who did not sign an authorization form?

> Does the Collective Bargaining Agreement require the Employer to make sure that the employer authorization form is executed by the employees and sent to the Union?

In its post-hearing brief to the Arbitrator, Host addressed these issues and the issues raised by Local 11.  A true and correct copy of Host's post-hearing brief

3

with the names of Host employees redacted to protect their privacy is attached hereto as **Exhibit 3**.  It is also attached as Exhibit D to Local 11's Answer and Counterclaim filed in this matter (ECF Doc. No. 12).

11.  On or about December 26, 2018, I caused a letter to be sent by email to Larry Stone, counsel for Host.  A true and correct copy of that letter is attached hereto as **Exhibit 4**.  It is also attached as Exhibit E to Local 11's Answer and Counterclaim filed in this matter (ECF Doc. No. 12).  Host's counsel did not respond to that letter.

12.  On or about January 18, 2019, I caused a letter to be sent by email to the Arbitrator and Mr. Stone.  A true and correct copy of that letter is attached hereto as **Exhibit 5**.  It is also attached as Exhibit F to Local 11's Answer and Counterclaim filed in this matter (ECF Doc. No. 12).  On or about January 22, 2019, the Arbitrator sent an email to me and to Mr. Stone in which he asked Mr. Stone if he would like to respond.

13.  On or about January 28 and 29, 2019, Mr. Stone and Mr. Zimmerman caused a letter to be sent by email to the Arbitrator and me respectively.  A true and correct copy of that letter is attached hereto as **Exhibit 6**.  It is also attached as Exhibit G to Local 11's Answer and Counterclaim filed in this matter (ECF Doc. No. 12).  On or about February 4, 2019, the Arbitrator responded by email to Mr. Stone, Mr. Zimmerman and me and notified us that "the Award stands as issued."

14.  Host has not complied with the remedy that the Arbitrator ordered in the Award.

I declare under the penalty of perjury of the laws of the United States that this declaration is true and correct.  This declaration was signed by me on this 25th day of March 2019 at San Francisco, California.

KRISTIN L. MARTIN

DECLARATION OF KRISTIN L. MARTIN                    Case No.: 19-cv-1568

## PROOF OF SERVICE
## STATE OF CALIFORNIA, CITY AND COUNTY OF SAN FRANCISCO

I am employed in the city and county of San Francisco, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is: 595 Market Street, Suite 800, San Francisco, California 94105.

On March 25, 2019 I served a copy of the following document(s) described as:

**RESPONDENT-COUNTERCLAIMANT UNITE HERE LOCAL 11'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CONFIRM ARBITRATION AWARD AND IN OPPOSITION TO PETITIONER HOST INTERNATIONAL, INC.'S MOTION TO VACATE**

on the interested party(ies) to this action as follows:

***By ECF System - Court's Notice of Electronic Filing:***

Steven M Zimmerman
Lawrence H Stone
Jackson Lewis LLP
725 South Figueroa Street Suite 2500
Los Angeles, CA 90017-5408
213-689-0404
Fax: 213-689-0430
Email: steve.zimmerman@jacksonlewis.com
        stonel@jacksonlewis.com

*Attorneys for Host International, Inc.*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 25th day of March, 2019 at San Francisco, California.

_____
Katherine Maddux

PROOF OF SERVICE                                    Case No.: 19-cv-1568

# Exhibit 1

Exhibit 1
1-6

**Transcript of Proceedings**
**February 27, 2018**

ARBITRATION PROCEEDING

BEFORE ARBITRATOR PRIHAR


In The Matter Of Arbitration
Between

UNITE HERE LOCAL 11

    and

HOST INTERNATIONAL, INC.
(LAX Union Dues)
_____




TRANSCRIPT OF PROCEEDINGS

February 27, 2018

9:32 a.m.

725 South Figueroa Street, Suite 2500

Los Angeles, California










REPORTED BY:
BRANDI CELESTINO
CSR NO. 13640

**Exhibit 1**
**1-7**

Transcript of Proceedings
February 27, 2018

1          Joint Exhibit 4 is the 2012/2015 collective

2   bargaining agreement between the parties.

3          Joint Exhibit 5 is a prior agreement between the

4   parties regarding furnishing the various evidentiary

5   materials.

6          MS. MARTIN:  I'll point out that this document

7   is two-sided.

8          ARBITRATOR PRIHAR:  Thank you.  It's a two-sided

9   document.  It looks like it was dated October 26, 2017.

10         Those are joint exhibits and received into

11  evidence.

12         The parties have not stipulated to the issues --

13  I'm going to let them frame those issues in just a

14  moment -- however, they have stipulated to my authority

15  to frame the ultimate issues in this case after the case

16  is concluded and the briefs are submitted.

17         The parties have stipulated to my authority to

18  retain jurisdiction regarding the remedy in this matter,

19  if one is needed.

20         Lastly, the parties have stipulated to waive the

21  Article 11, Section 11.7 requirement that I submit a

22  decision within 30 days of hearing or submission of

23  post-hearing briefs, and I thank the parties for that.  I

24  do try to hit the 30-day deadline.  Sometimes that just

25  doesn't happen.  I appreciate that stipulation.

**Exhibit 1**
**1-8**

Transcript of Proceedings
February 27, 2018

```
 1              As far as my summary so far, is that a correct

 2   summary of our off-record discussions, first, for the

 3   union?
```
Transcript of Proceedings
February 27, 2018
```
 4              MS. MARTIN:  Yes.

 5              ARBITRATOR PRIHAR:  And for the employer?

 6              MR. STONE:  Yes.

 7              ARBITRATOR PRIHAR:  Do either of you wish to add

 8   anything before we go further?

 9              MS. MARTIN:  No.

10              MR. STONE:  No.

11              ARBITRATOR PRIHAR:  With that, let me turn to

12   the Union and allow the Union to state its issues as it

13   sees the case.

14              MS. MARTIN:  There are three parts to the issue

15   that I'm about to state.

16              The first is procedural and the second and third

17   are substantive.

18              The procedural issues:  Should the grievance be
```
```
19   sustained because the employer failed to make a timely

20   written response to Step 2 of the grievance process?  If

21   so, what is the appropriate remedy?

22              If the grievance is not sustained on the

23   aforementioned procedural ground, then the following two

24   issues should be resolved by the arbitrator.

25              First, did the employer violate Article 2 of the
```

**Exhibit 1**
**1-9**

Transcript of Proceedings
February 27, 2018

```
 1   collective bargaining agreement by failing to provide,

 2   assist in the completion of, and/or omit union membership

 3   applications and dues check-off authorizations to the

 4   union?  If so, what is the appropriate remedy?

 5           The second substantive issue, which would be

 6   resolved if the grievance is not sustained on the

 7   procedural grounds, is, did the employer violate Article

 8   2 of the collective argument agreement by failing to

 9   deduct union initiation fees and/or monthly dues from

10   employees' earnings?  If so, what is the appropriate

11   remedy?

12           ARBITRATOR PRIHAR:  Thank you.

13           Issues stated by the employer.

14           MR. STONE:  Thank you.

15           A number of issues, procedural.  The first is

16   the grievance has been entered into the record as

17   Joint Exhibit 2, and it is set forth as a class action

18   grievance.  We raise an issue if the Union has the right

19   to file a class action under the collective bargaining

20   agreement.

21           Second issue is timeliness issue based on when

22   the grievance was filed.  The grievance was filed

23   March 15, 2017.  This case has to do with Union dues and

24   initiation fees that allegedly were not deducted or sent

25   to the Union, but it dates back to February of 2016.
```

**Exhibit 1**
**1-10**

Transcript of Proceedings
February 27, 2018

```
 1            We think that each instance, really, would

 2    amount to a separate grievance since they are separate

 3    and distinct obligations; therefore, we think that this

 4    grievance is untimely.  The only aspect of this that is

 5    timely is if you look at the grievance under the

 6    collective bargaining agreement.  The Union has 15

 7    days -- either party has 15 days from the occurrence of a

 8    disputed aspect to raise it as a grievance.  If you go

 9    back to March 1, there are only about 379 occurrences,

10    which would be encompassed by the grievance.  There were

11    no additional grievances filed, but it would leave the

12    vast majority of this case as untimely.

13            In terms of the merits, whether the language of

14    Article 2.12 is unlawful, if enforced against those

15    employees.  It did not sign the Union authorization form

16    by finding an authorization of this collective bargaining

17    agreement, and whether the collective bargaining

18    agreement was violated with respect to the failure to

19    deduct dues and initiation fees for the employees that

20    did not sign an authorization form.

21            As a final, whether the aspect -- what seems to

22    be implied here is that the employer seems to make sure

23    that the employer authorization form is executed by the

24    employees and sent to the Union and -- I guess it would

25    be an aspect of whether the collective bargaining
```

**Exhibit 1**
**1-11**

Transcript of Proceedings
February 27, 2018

1  agreement actually makes that requirement.  There is

2  language in the agreement that talks about assisting the

3  union, and that's what the employer has done.  We're

4  nothing more than a payroll service, so whether that can

5  even be cited is a violation.

6          ARBITRATOR PRIHAR:  All right.  Thank you very

7  much.

8          Before we go further, is there anything else

9  that the parties wish to address or put on the record?

10          MR. STONE:  No.

11          MS. MARTIN:  No.

12          ARBITRATOR PRIHAR:  With that, we're ready to

13  proceed.

14          MS. MARTIN:  There is one issue:  The Union

15  produced the Union bylaws to the employer on the

16  condition that they maintained confidential, not used for

17  any purpose outside of this case and be returned to the

18  Union at the conclusion of this proceeding.

19          ARBITRATOR PRIHAR:  My understanding is you're

20  amenable to that?

21          MR. STONE:  That's fine.

22          ARBITRATOR PRIHAR:  Thank you.  With that, I

23  invite opening statements.  Turn to the Union.

24          MS. MARTIN:  So, as you have learned, that this

25  case is about the dues check-off language in the

**Exhibit 1**
**1-12**

Transcript of Proceedings
February 27, 2018

```
 1  STATE OF CALIFORNIA     )
                            )
 2  COUNTY OF LOS ANGELES   )

 3

 4       I, Brandi Celestino, a Certified Shorthand Reporter,

 5  do hereby certify:

 6

 7       That prior to being examined, the witness in the

 8  foregoing proceedings was by me duly sworn to testify to

 9  the truth, the whole truth, and nothing but the truth;

10       That said proceedings were taken before me at the

11  time and place therein set forth and were taken down by

12  me in shorthand and thereafter transcribed into

13  typewriting under my direction and supervision;

14       I further certify that I am neither counsel for, nor

15  related to, any party to said proceedings, not in any way

16  interested in the outcome thereof.

17       In witness whereof, I have hereunto subscribed my

18  name.

19

20  Dated:  February 27, 2018

21

22

23  _____

24

    Brandi Celestino
25
```

**Exhibit 1**
**1-13**

# Exhibit 2

Exhibit 2
2-14

Kristin L. Martin
McCRACKEN, STEMERMAN & HOLSBERRY, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Telephone: 415-597-7200
Fax: 415-597-7201

*Attorneys for UNITE HERE Local 11*

## IN THE ARBITRATION PROCEEDINGS BEFORE

## ARBITRATOR GUY PRIHAR

| | |
|---|---|
| In the Matter of a Controversy<br><br>Between<br><br>Host International, Inc.<br><br>Employer,<br><br>and<br><br>UNITE HERE Local 11<br><br>Union.<br><br>(LAX Union Dues) | **UNION'S POST-HEARING BRIEF** |

**Exhibit 2**
**2-15**

## **Table of Contents**

Issues.................................................................................................................................... 1

Statement of Facts ............................................................................................................ 2

  A.  The Dues Collection System ................................................................................... 2

      1.  Host distributes and collects dues cards at orientation.................................... 2

      2.  Host deducts dues each month and sends Local 11 a report. .......................... 3

      3.  Local 11 attempts to identify missing dues payments..................................... 4

  B.  Dues deductions from the former CMS employees' wages ................................... 6

      1.  Host hired about 300 employees who had worked for CMS. .......................... 6

      2.  Carolina Simmons discovered that Host did not deduct September and October dues from the CMS employees' wages. ................................................................ 6

      3.  Host agreed to deduct dues from the CMS employees' wages. ...................... 7

      4.  Host did not deduct dues from all of the former CMS employees' wages. ..... 8

  C.  Local 11 tried repeatedly to fix the problem. ....................................................... 9

      1.  Carolina Simmons' efforts in 2016 ................................................................. 9

      2.  Carolina Simmons' efforts in 2017 ............................................................... 11

  D.  Local 11 filed this grievance. .............................................................................. 12

  E.  Host broke promises it made after the grievance was filed.................................. 13

  F.  Local 11's further efforts in 2017 and 2018 ....................................................... 14

Argument ........................................................................................................................ 15

  A.  The Employer defaulted during the grievance process. ....................................... 15

  B.  Host violated the Article 2.................................................................................... 16

**Exhibit 2**
**2-16**

1.   Host failed to deduct dues from the wages of employees who signed dues cards. ........ 17

2.   Host failed to present dues cards to employees and assist employees to complete the cards. ......................................................................................................................... 19

3.   Host has the burden of proving that it complied with Articles 2.7 and 2.10. ................ 21

C.   Host's long list of defenses amount to nothing. .................................................................. 23

1.   Article 2.12 does not require Local 11 to seek the back dues from employees instead of Host. ........................................................................................................................... 23

2.   The Union's record-keeping is not the problem. ............................................................ 25

3.   Labor law's anti-bribery statute does not prohibit a monetary remedy to Local 11. ..... 25

4.   Host does not have a timeliness defense. ...................................................................... 27

5.   Local 11 was not required to file hundreds of separate grievances. ............................. 29

6.   Local 11 did not abandon this grievance in bargaining. ................................................ 29

Remedy ......................................................................................................................................... 30

Conclusion ................................................................................................................................... 32

Exhibit 2
2-17

**Issues**

The parties stipulated to give the Arbitrator authority to frame the issue.  Tr.[1] 6.  Local 11

asked the Arbitrator to decide the following issues:

> 1.  Should the grievance be sustained because the Employer failed to make a
> timely written response to Step 2 of the grievance process?  If so, what is the
> appropriate remedy?
>
> 2.  Did the Employer violate Article 2 of the Collective Bargaining Agreement by
> failing to provide, assist in the completion of, and/ or remit union membership
> applications and dues deduction authorizations to the Union?  If so, what is the
> appropriate remedy?
>
> 3.  Did the Employer violate Article 2 of the Collective Bargaining Agreement by
> failing to deduct union initiation fees and/or monthly dues from employees'
> earnings?  If so, what is the appropriate remedy?

Tr.(I) 7-8.

Host's counsel described four issues in narrative form: (a) whether Local 11 improperly

filed a class-action grievance; (b) whether the grievance is timely; (c) whether Local 11 can

lawfully require Host to deduct dues from the wages of employees who did not authorize

deduction; and (d) whether Host must ensure that employees sign the dues authorization form.

Tr.(I) 8-10.  The last two issues are not actually matters in dispute.  Local 11 agrees that Host

may not deduct dues from employees' wages without a written authorization and that Host may

not compel employees to agree to dues deduction.  Jt. Ex. 6 (¶¶ 3-4).

///

///

///

---

[1] The transcript for each day of hearing begins with page 1.  The abbreviation "Tr.(I)" refers to
the transcript for the first day of hearing.  The transcripts for the subsequent days of hearing are
identified as "Tr.(II)"; "Tr.(III)", and "Tr.(V)."  No testimony was given on the fourth hearing
day.

**Exhibit 2**
**2-18**

**Statement of Facts**

A.      **The Dues Collection System**[2]

      1.      **Host distributes and collects dues cards at orientation.**

Host operates food concessions at airports around the United States, and Local 11 represents Host's employees at LAX.  There are currently about 1,000 to 1,200 employees in the LAX bargaining unit but that number fluctuates seasonally and when Host acquires new outlets.  Tr.(II) 101; Tr.(III) 55.  Local 11 has represented Host's employees at LAX since at least 1997.  Tr.(I) 166-67.  During that time, Local 11 has provided Host with blank copies of its dues card forms[3] and Host's practice has been to distribute dues cards in orientation meetings that all newly-hired employees are required to attend before starting work.  Tr.(I) 30-31, 167-68; Tr.(II) 94-95, 107-09, 118-19; Tr.(III) 37-38, 55-56; Tr.(V) 24-25, 43; Un. Ex. 1.  Local 11 has relied on that practice.  Its representatives have the right to attend orientation meetings, but they don't ordinarily do so.  Tr.(I) 168; Tr.(II) 95-96, 112-13, 119-20; Jt. Ex. 6, at ¶ 1.

Local 11 uses a dual-purpose card that allows employees to apply for membership and authorize dues to be deducted from their paychecks.  Tr.(I) 30; Un. Ex. 1.  The employee applies for membership in Local 11 by filling out the card.  To authorize Host to deduct dues from the employee's wages, the employee must initial where it says "Initial here for Check-Off."  Un. Ex. 1.  When Host distributes the dues card to employees during orientation, it explains to employees that they must become members of Local 11, but they do not have to authorize deduction of their

---

[2] This case involves Host's obligations with respect to monthly dues and initiation fees.  As to both, Host's obligations are the same.  *See* Jt. Ex. 1, at 3 (Arts. 2.10 & 2.11).  In this brief, we use the word "dues" as shorthand for both dues and fees.

[3] This form is variously referred to as a "union card", a "union authorization card", a "dues checkoff card" a "dues authorization card" and a "dues card."  In this brief, the term "dues card" will be used.

**Exhibit 2**
**2-19**

union dues from their wages.  Tr.(V) 24-25; *see also* Jt. Ex. 1 (Art. 2.2 & 2.3) (union membership is a condition of employment).

>    **2.   Host deducts dues each month and sends Local 11 a report.**

Within a few days of each orientation session, Host enters each dues deduction authorization into the employee's file in Host's computer system (PeopleSoft), puts a hard copy of the card in the employee's personnel file and sends another copy to Local 11.  Tr.(III) 62-63; Tr.(V) 38-41.  Host then begins deducting dues from the first paycheck each month.  Tr.(III) 96-97.  Host knows how much to deduct because Local 11 notifies Host how much its dues are when the rates change, and Host also enters that information into PeopleSoft.  Tr.(I) 41-42; Tr.(V) 63; Un. Ex. 3.  The deduction is automated.  If Host has entered the dues card authorization into PeopleSoft, then dues will be deducted automatically.  Tr.(III) 62-63, 97; Tr.(V) 41, 63.

Each month, Host sends the entire amount that it has deducted from LAX employees' wages to Local 11's bank account via ACH bank transfer.  Tr.(II) 8; Tr.(III) 96-97.  Host also sends Local 11 a "Dues Report" by email.  Tr.(I) 32-33; Tr.(II) 10-12, 30-32; Un. Exs. 12, 24; Em. Ex. 2.  Employees, who are identified on the Dues Report by name and social security number, fall into two categories:

- Employees from whose paychecks some form of union dues (monthly dues, initiation fees or dues arrears[4]) has been deducted; and

- Employees from whose paychecks the full amount of union dues, initiation fees or dues adjustments has <u>not</u> been deducted.  This occurs when the net take-home pay is

---

[4] The Dues Report has a column for arrears (with the heading "ONEADJ Fee") but deduction of arrears is extremely rare as the dues reports that are Union Exhibit 12 and Employer Exhibit 2 demonstrate.  *See also* Tr.(III) 120-21.

**Exhibit 2**
**2-20**

insufficient because taxes on the employee's tips have eaten up most or all of the employee's wages.[5]

Tr.(I) 157-58; Tr.(II) 17-18; Tr.(III) 101-02.  The Dues Report does <u>not</u> include employees whose net pay after taxes is sufficient to pay union dues, but from whose paychecks Host has not deducted dues.  Tr.(I) 157-58; Tr.(III) 119-22.  These employees also fall into two categories: employees who did not sign a dues card authorizing dues to be deducted from their wages; and employees who did sign a dues card, but from whose wages Host failed to deduct dues.  Tr.(II) 19, 83-84.

### 3.    Local 11 attempts to identify missing dues payments.

When Local 11 receives the Dues Report, Dues Processor Carolina Simmons converts the report into a form that Local 11's computer program (known as TIMMS) can read and removes unnecessary information.[6]  What is left is a simple report with three columns: employee name, social security number and the amount of dues deducted.  Tr.(II) 10-12; *see e.g.*, Un. Ex. 12

---

[5] Host's counsel asserted that dues could not be deducted if the net pay after the deduction would be less than the minimum wage.  Tr.(I) 140, 143, 146; *see also* Tr.(I) 158-59.  Host's Senior Director of Labor Relations said that proposition depends on state law.  Tr.(III) 59.  Both are incorrect.  An employee's agreement to dues deduction is simply a contractual assignment by the employee of some of her wages to the union.  *See* 29 U.S.C. § 302(c)(4) (describing dues-deduction authorization as an "assignment").  It is not an involuntary garnishment.  The employee can choose to assign her wages to the union, just as she could assign her wages to her landlord for rent, or to her gym for a membership, or to anyone else to whom the employee chooses to give her money.  Minimum wage law has nothing to do with it.  Moreover, federal law preempts states from regulating union dues deduction.  *IAM Dist. Ten v. Allen*, __ F.3d __ (7th Cir. Sept. 13, 2018); *UFCW Local 99 v. State of Arizona*, 934 F.Supp.2d 1167, 1182 (D. Ariz. 2013); *Seapak v. Industrial, Technical and Professional Emp., Division of National Maritime Union, AFL-CIO*, 300 F. Supp. 1197 (N.D. Ga. 1969), *aff'd* 400 U.S. 985 (1971).

[6] At the hearing, Host's counsel made a big deal about the fact that Simmons removes information about employees from whose wages no dues are deducted.  There is a good reason why Simmons does this.  TIMMS is a database of dues that employee have paid.  It does not catalogue the reasons why employees have not paid dues.

**Exhibit 2**
**2-21**

(excel chart labeled "010.2016-02 Report").  Simons then uploads that information into TIMMS.  Tr.(II) 12.

Next, Simmons attempts to determine whether any employees have not paid dues by generating a "Missing Payment Report" from TIMMS.  The Missing Payment Report lists employees who appear in TIMMS as Host employees, but from whose wages no dues have been deducted.  Importantly, the Missing Payment Report does <u>not</u> list all Host employees who have not paid dues that month.  That would be impossible.  Local 11 cannot include employees on the report unless it knows that the employee works for Host.  In other words, if an employee has not been identified in TIMMS as a Host employee, the employee will not show up on the Missing Payment Report.[7]

Simmons sends the Missing Payment Report to Host, and requests an explanation why no dues have been deducted from the wages of each employee listed on the report.  Tr.(I) 33-38; Tr.(II) 20-22, 69-70, 81; Un. Ex. 2; Em. Ex. 1.  Host responds sometimes, but not always.  Tr.(I) 38-39; Tr.(V) 55.  If Host responds to the Missing Payment Report, Local 11 might learn, for example, that the employee is on a leave of absence or is no longer working for Host.  Tr.(I) 37-38.  But sometimes Host just responds that the employee is "Active" without explaining why no dues were deducted.  *See, e.g.*, Un. Ex. 25.  Host has never responded to a Missing Payment Report by telling Local 11 that it did not deduct dues because the employee had not signed a dues card.  Tr.(I) 39; Tr.(V) 54-55.

///

///

---

[7] To update the TIMMS database, Local 11 periodically requests "employee rosters" from Host, showing all employees working for Host.  Tr.(I) 41, 43-44, 118-19, 158; Tr.(II) 19-21; Un. Ex. 4.

**Exhibit 2**
**2-22**

B.      **Dues deductions from the former CMS employees' wages**

     1.      **Host hired about 300 employees who had worked for CMS.**

On August 20, 2016, Host acquired twelve outlets at LAX from another concessionaire called CMS.  Tr.(I) 169; Tr.(II) 133-34; Tr.(III) 53-54; Un. Ex. 18; Un. Ex. 26.  Host retained most of the approximately 300 CMS employees, and those employees continued working in the same outlets as when they had worked for CMS.  Tr.(II) 165-66; Tr.(III) 54-55; Un. Ex. 18.  The outlets remained opened and there was no gap the former CMS employees' employment.[8]  Tr.(II) 96-97; Tr.(III) 65; Tr.(V) 26-27.  Host treated the CMS employees as new hires, and required them to undergo the same new-hire orientation as other newly hired employees, except that the orientations were scheduled to accommodate the CMS employees' schedules and the program was condensed into one day.  Tr.(I) 170-71; Tr.(II) 97, 140; Tr.(III) 63-64; Tr.(V) 26-27, 30-31.

     2.      **Carolina Simmons discovered that Host did not deduct September and October dues from the CMS employees' wages.**

On September 6, 2016, Host sent Local 11 the September Dues Report, and on October 11, 2016, Host sent the October Dues Report.  Un. Ex. 12.  Those reports did not include the former CMS employees.

On October 13, 2016, Local 11 Dues Processer Carolina Simmons contacted Host's Regional Assistant Human Resources Director Angelina Preston, who was doing the LAX Human Resources Manager job because the prior Human Resources Manager (Ava White) left

---

[8] Host's counsel elicited much testimony about the airport badging process, but that is irrelevant. The former CMS employees were able to work for Host under their CMS badges while waiting for their Host badges to be approved.  Tr.(III) 64; Tr.(V) 32-34.

**Exhibit 2**
**2-23**

the month before and Host had not filled the position.  Simmons told Preston that Host had not

deducted dues from the former CMS employees' wages:

> Can you please let me know how the deductions are going as far as the new members acquire from CMS.

> HMS Host is responsible for the Sept. 2016.  Those dues were not deducted.  The members now owe September and October 2016.  Can you confirm if October was deducted?

> Also, Local 11 understands that is the company's responsibility for those extra deductions, and expect the company to deduct double the dues for all the members that owe Sept & October 2016.

Un. Ex. 14.  Preston responded that she would check.  *Id.*

> Simmons followed up on October 17 with this message to Preston:

> Any updates on this?  I have been receiving calls from members that are really upset that they will be owing 2 months worth of dues.

> We need to fix this issue as soon as possible.

*Id.*  Again, Preston responded that she would check.  *Id.*

### 3.      Host agreed to deduct dues from the CMS employees' wages.

A few hours later, Preston sent her responses to Simmons in "ALL CAPS":

> Can you please let me know how the deductions are going as far as the new members acquire from CMS.

> HMS Host is responsible for the Sept. 2016.  Those dues were not deducted.  The members now owe September and October 2016.  Can you confirm if October was deducted?

> THIS WAS NOT UNFORTUNATELY DEDUCTED.  CAN YOU PLEASE SEND ME A LIST OF CMS NAMES SO THAT WE CAN SEND THEIR INFORMATION TO CORPORATE.

> Also, Local 11 understands that is the company's responsibility for those extra deductions, and expect the company to deduct double the dues for all the members that owe Sept & October 2016.

> WE WILL DEDUCT ARREARS AND MOVING FORWARD WE WILL CONTINUE TO DEDUCT.  WHAT IS THE AMOUNT THEY WILL PAY

**Exhibit 2**
**2-24**

> MONTHLY – IS IT THE SAME AS OUR SCALE?  CAN YOU PLEASE
> SEND.

*Id.*  Simmons responded that she did not have the list Preston had requested, and Preston then responded that she had a list from CMS that she could "cross-reference" to determine which CMS employees Host had employed.  *Id.*; Tr.(II) 163-64, 166.

On October 18, Simmons sent Preston a list of 312 former CMS employees, along with the amount of dues that each owed for September and October 2016.  Un. Ex. 14.  On October 21, Preston responded that 43 of the former CMS employees were not "active employees (termed or never transitioned) or are not union associates", Un. Ex. 15; implying that Host had employed the other 269 former CMS employees.  In the same email, Preston said, "Per Corporate we are asking accounts payable to expedite payment by the end of month.  I will let you know if this has been granted."  *Id.*  Simmons thought that the problem was solved.  *Id.*

**4.      Host did not deduct dues from all of the former CMS employees' wages.**

Host deducted the September and October dues from 239 of the former CMS employees named on the list attached to Union Exhibit 14 in two batches: 95 in second October pay period and 144 on about November 9 with the regular November dues deduction.  The October deductions appear on Union Exhibit 12(b), and the November deductions appear on Union Exhibit 12 (chart labeled "010.2 2016-11 Report").  *See also* Un. Ex. 12 (chart labeled "010.1 2016-11 Email from J. Sutherland re Nov 2016 Dues Reports" stating that "the 2nd arrears deductions are listed under the ONEADJ code").

But Host did not fix the problem completely.  First, Host did not deduct any dues from the remaining thirty or more former CMS employees who are listed on Union Exhibit 14 and who are not among the group that Preston said were not working for Host.  If Host had done so,

**Exhibit 2**
**2-25**

the deductions would be reflected on the Dues Reports that are compiled on Union Exhibit 12 and Employer Exhibit 2.  They are not there.

Second, Host did not underline{continue} to deduct dues from the former CMS employees from whose October 2016 wages it deducted the September and October dues.  The chart that is Appendix A to this Brief compiles the evidence about twelve employees who are among those on the list attached to Union Exhibit 14: five employees from whom the September and October dues were deducted in October, as reflected on Union Exhibit 12(b) (███████████████████ ███████████████████████████████████ ); and seven employees from whom the September and October dues were deducted in November, as reflected on Union Exhibit 12 (chart labeled "010.2 2016-11 Report") (███████████████████████ ██████████████████████████████████████ ).[9]  These employees are examples.  After deducting the September and October dues from the October wages of the first group, Host did underline{not} deduct dues from their wages in subsequent months.  These employees are examples.  The same is true about the other 92 employees from whose wages Host deducted the September and October dues in October 2016.

**C.**    **Local 11 tried repeatedly to fix the problem.**

　　　　**1.**    **Carolina Simmons' efforts in 2016**

---

[9] The employees from whose wages the September and October dues were deducted in October appear primarily, but not exclusively, on pages 1 to 10 of the list attached to Union Exhibit 14. The employees from whose wages the September and October dues were deducted in November appear primarily on pages 11 to 17 of the list.  We chose employees in each sample group whose last names begin with "A" and whose names are uncommon, making it unlikely that Host employs another employee with the same name.  We also included two employees (██████████ ████████████████████████ ) who are among those that Preston's October 21 email says Host did not employ.

**Exhibit 2**
**2-26**

In late 2016, Simmons realized that there were still problems with Host's dues deductions because a few Host employees contacted her to report that dues had not been deducted from their paychecks.  When this occurred, Simmons notified the person who was doing the Human Resources Manager job at the time.  Tr.(I) 44-45.  On November 15, 2016, Simmons sent an email to Jeff Pantel:

> Can you verify the reason why ██████████ [SSN] not paying dues.
>
> Also, can you please let me know if others in his location are in the same boat.

Un. Ex. 5; Tr.(I) 45-47.  Pantel responded that he would "reach out to Cindy [Yasuda] and make sure we get it taken care of."  Un. Ex. 5.

On November 18, Simmons followed up with Yasuda.  *Id.*  Yasuda responded:

> I viewed this employee's record and saw no issue with his hire record in PeopleSoft.  I can contact our IT corporate group to inquire, but I have no explanation for why his dues are not being deducted from his paycheck.

*Id.*  Simmons responded:

> This member needs to be deducted union immediately along with back dues.
>
> I got to ask who else can be under the same situation.  Can you make sure that all HMS host workers are being deducted.

*Id.*  Yasuda promised to respond, *id.*; but she didn't.  Tr.(I) 50.

Next, on December 9, 2016, Simmons contacted Angelina Preston about two employees (██████████ and ██████████████) who were not having dues deducted and said, "pretty sure there are more."  Un. Ex. 5.  Preston promised that Yasuda would research it, *id.*; and Yasudo reiterated that she would do so:

> We concur this is a serious matter.
>
> We are in the process of auditing our records to determine which active employees are/or not paying dues.

**Exhibit 2**
**2-27**

> Our goal is to complete the audit early next week.  We will continue to keep you posted on our progress, thank you.

*Id.*  On December 15, 2016, Simmons emailed Yasuda and Preston again:

> Any updates on this issue?
>
> ████████ came in on Monday to discuss and understand the reason why her dues are not being deducted.  I need to make sure we all understand the severity of this issue.
>
> Members have been there almost 6 months and not paid any dues.
>
> Please give me an update as soon as possible.

*Id.*  By "members have been there 6 months", Simmons was referring to the former CMS employees and employees whom Host hired during the busy summer season.  Tr.(I) 52.  Once again, Preston said that she would talk to Yasuda.  Un. Ex. 5.

Host did not begin deducting dues from ████████'s and ████████████'s wages until April 2017, and it did not deduct dues from ████████'s wages at all.  This is so, even though ████████████ and ████ signed dues cards in February 2017, July 2016 and May 2016 respectively.  *See* Appendix B.  Yasuda's November 18 email ("I have no explanation for why his dues are not being deducted from his paycheck") suggests that ████████ also signed another dues card months earlier.

### 2.   Carolina Simmons' efforts in 2017

By January 2017, Faith Baaadamako was Host's Human Resources Manager at LAX.  On January 30, Simmons requested a phone conversation with Baaadamako and Preston.  Un. Ex. 6.  On that call, Preston admitted that there was a "big problem" and promised to work with Simmons to fix it.  Tr.(I) 57-58.  On February 8, 2017, Baaadamako sent an email to Simmons about her planned research, and asked if Simmons could run a report of dues authorization cards.  Baaadamako explained, "My goal then would be to go out and get dues authorization cards.  I know I don't have any for CMS."  Un. Ex. 6.  Simmons promised to send the list, and also sent

**Exhibit 2**
**2-28**

Baaadamako the names of five more "New Members that are not paying union dues, but sign in [sic] a membership application." *Id.*; Tr.(I) 59-60.  Host did not deduct dues from these five employees' wages until April 2017.  One of those employees signed a dues card in May 2016 and another signed a card in January 2017.  *See* Appendix B.

Sometime before February 23, 2017, Simmons met in person with Baaadamoko and Preston at their office.  Again, Baaadamoko and Preston said that "they were willing to work with [Simmons by] trying to collect the membership cards and start the dues deductions."  Tr.(I) 69.  On February 22, 2017, Simmons requested that Baaadamako send a list of all the CMS employees now working for Host.  Baaadamako promised to work on it.  Un. Ex. 19.  Simmons sent a reminder on March 9, *id.*; but Baaadamako never provided the list.  Tr.(II) 203-05.

On February 23, Simmons sent an "audit of members not paying union dues" to Baaadamako and Preston that listed 200 employees.  Simmons offered to answer any questions and asked to be informed "when you get an answer from corporate about the payment."  Un. Ex. 7(a, b); Tr.(I) 63-66.

**D.    Local 11 filed this grievance.**

Simmons told Local 11's Administrative Lead Martin Lopez that she was not getting anywhere in her efforts to resolve the problem with Host, Tr.(II) 253; so on March 15, 2017, Local 11 filed a grievance against Host for not collecting dues cards or sending dues to Local 11.  Jt. Ex. 2; Tr.(II) 205-06.

The grievance meeting was held on April 10, 2017.  Martin Lopez and Carolina Simmons represented Local 11.  Faith Baaadamako and Host's Senior Director of Operations Eric Walden represented Host.  Lopez said that Local 11 had been trying to solve the problem for several months.  Baaadamako asked what Local 11 had done to collect the dues cards.  Tr.(II) 206-08.  Baaadamako also said that some employees had refused to sign dues cards.  Lopez asked who

**Exhibit 2**
**2-29**

they were but Baaadamako did not respond and no one at Host answered Lopez's question at a later time. Tr.(II) 208-09. Lopez asked Walden for Host's position. Walden declined to give one, saying that he would let Host's attorneys argue. Tr.(II) 209. Neither Baaadamako nor Walden said that Local 11's position was unlawful, that Local 11's grievance was untimely or that Local 11 should have filed multiple grievances instead of a single class action grievance. Tr.(II) 210. Host never sent a written response to the grievance. Tr.(II) 209-10.

**E.    Host broke promises it made after the grievance was filed.**

On May 31, 2017, Martin Lopez, along with Local 11 Organizing Director Robin Rodriguez, spoke to Host's Senior Director of Labor Relations Brian Donohoe by phone about the grievance. Tr.(I) 171-72. The conversation was short. Donohoe said that that Local 11 should collect the dues cards during employee orientations, and that it was not Host's responsibility to do so. Rodriguez explained that the practice had been for Host to collect dues cards at orientations. Tr.(I) 173; Tr.(II) 211-13. Lopez described Local 11's efforts to resolve the problem. Donohoe asked Lopez to send him a copy of Simmons' audit. Tr.(II) 213-14. Donohoe also admitted that Host's "new HR person" Faith Baaadamako "was not doing the best job" keeping up with Human Resources systems, including dues cards. Tr.(I) 175. By October 2017, Baaadamako was no longer working for Host. Tr.(II) 128.

Donohoe gave a different and evolving account of the conversation. He first said that the concern that Rodriguez and Lopez expressed was that the Host managers had not given them information that they had requested about employees. Tr.(V) 39-40. Donohoe later said that Rodriguez and Lopez asserted that Host was responsible for the back dues, which indicates that they were concerned about more than just getting information. Tr.(V) 40-41.

According to Donohoe, he concluded the conversation by promising to send an updated employee roster, and the "branch" sent Local 11 the requested roster in June. Tr.(V) 41-44.

**Exhibit 2**
**2-30**

Host did not introduce a documents to corroborate Donohoe's claim. The paper trail reveals a different story.

After the telephone call, Martin Lopez sent Donohoe the reports that Simmons had prepared, along with an update. Lopez reiterated, "We have been asking for a while that the Company audits this list and provides updated information as to the current employment status for all these employees." Un. Ex. 8(a). Donohoe promised to take action:

> I spoke with our team at LAX today and we can commit to completing our review of the list that you forwarded by next Friday, June 9. To the extent that there remains active employees on that list who have signed a dues authorization card but are not having dues deducted, or who have not been presented an opportunity to have their dues deducted from their paycheck, we have set the following Friday, June 16, as our target for having that follow up completed.

Un. Ex. 8(a). Donohoe did not do that. Tr.(II) 214-16.

On June 30, 2017, Lopez followed up with Donohoe, asking, "Any news on your team completing the review of the list? When can we expect to have a response?" Un. Ex. 8(a). Donohoe did not respond. Tr.(II) 216; Tr.(III) 72-73.

## F.    Local 11's further efforts in 2017 and 2018

On June 20, 2017, Simmons contacted Baaadamako and Preston about an employee named ▮▮▮▮▮▮▮▮▮:

> ▮▮▮▮▮▮▮▮▮ informed Marlene that her union dues have not been deducted even though she has been working @ HMS HOST since August 2016.

> Not sure what's going on still Faith, can you please send me a roster. I need to know who else is in the same boat. I didn't think this is still going on.

Un. Ex. 9; Tr.(I) 81. ▮▮▮▮▮▮ signed a dues card in December 2017, but Host did not begin deducting dues from her wages until February 2018. *See* Appendix B.

On August 15, 2017, Simmons emailed Preston a dues card for an employee named ▮▮▮▮▮▮▮▮, with the comment, "Still finding members that are not being deducted properly,

**Exhibit 2**
**2-31**

can you make sure moving forward this members get union dues deducted."  Un. Ex. 16.  

signed a dues card in March 2017, but Host never began deducting dues from ████'s wages.

*See* Appendix B.

      On March 14, 2018, Simmons emailed Preston a dues card for an employee named ████

████ with the following comment:

> ████████ came into our union office indicating that he has been working at
> HMS Host December 2017 and still his union dues have not been deducted.
>
> Can you confirm that he was in orientation and if a membership application was
> given, it looks like nothing has changed.  Members are still having issues with his
> dues and dues membership forms collection.
>
> Can you let me know the reason why this member still has not been deducted.  I
> provided his membership application for you, can you make sure he gets deducted
> his monthly union dues and initiation.

Un. Ex. 17.  This time Preston responded:

> Unfortunately, I am not sure what happened with this previously and why the
> deduction did not go through.  However, Astrid reentered it into our system
> yesterday.  He will be deducted next pay period.

Un. Ex. 18.

## Argument

### A.    The Employer defaulted during the grievance process.

      Article 10.2 of the Collective Bargaining Agreement describes Step 2 of the grievance

process, which is where this grievance began since it is a "contract language" grievance.  Jt. Ex.

1, at 17 ("All . . . disputes of contract language shall begin at Step Two.").  It requires Host to

"submit a written response to the grievance within ten days of the Step Two meeting" not

including Saturdays, Sundays or holidays.  *Id.* (Art. 10.4).  There are consequences for Host if it

disregards this obligation.  "If a written response is not made within the time limits set forth in

Step Two, the grievance will be considered sustained."  *Id.*

**Exhibit 2**
**2-32**

The grievance meeting was held on April 10, 2017.  Tr.(II) 206.  Not only did Host not respond within ten working days (April 24), Host did not ever submitted a written response to Local 11's grievance.  Tr.(II) 209-10.  For this reason alone, Local 11's grievance should be sustained.

There are important reasons for the written response requirement.  It forces the nongrieving party to determine during the grievance process what its legal position is and to do the investigation necessary to make that determination.  If the grievance is arbitrated, the parties can present their cases efficiently because their legal positions have been established.  That is not what happened here.  The hearing in this case stretched on for five days while Host's counsel served wide-ranging document subpoenas on Local 11 before each day of hearing (two of which the Arbitrator revoked), recalled witnesses to ask about topics that did not occur to him during the initial examination, and conducted unfocused and pointless examinations.  Through all of this, he appeared to be fishing for a theory.  That wasted both parties' time and money.

**B.      Host violated the Article 2.**

The Collective Bargaining Agreement's dues provisions make it possible for Local 11 to collect dues through deductions from employees' wages.  These are critically important provisions for Local 11 because they eliminates the time and expense that collecting dues would otherwise entail.  Tr.(II) 235-36. Article 2.7 requires Host "to provide, assist in the completion of, and remit any forms necessary to perfect membership in Local 11." Jt. Ex. 1, at 3.  As explained above, the dues cards serve as both membership applications and dues deduction authorizations.  When employees complete dues cards authorizing deduction, Article 2.10 requires Host to deduct dues from employees' paychecks.  *Id.*  This is a simple system that Host administers.  Except in the rare case when an employee chooses not to authorize dues deduction,

**Exhibit 2**
**2-33**

the system places little burden on Local 11.  All that Local 11 should have to do is supply Host with blank dues card forms and process the money it receives each month.

In this section, we show that Host violated one or both of these obligations.  Host did not deduct dues from employees' wages even when employees authorized it to do so; and Host may not have always provided dues cards to employees or assisted employees to complete those cards.  The evidence that Local 11 presented shifted the burden to Host to prove that it complied with its Article 2 dues-deduction obligations.  Host did not meet that burden.

### 1. Host failed to deduct dues from the wages of employees who signed dues cards.

It is beyond dispute that, at least sometimes, Host failed to deduct dues from employees' wages even though the employees authorized Host to do so.  Consider these examples:

- ██████████ and ██████████ signed dues cards in August 2016, but Host only deducted their dues for September and October 2016.  *See* Appx. A.

- On November 2016, Cindy Yasuda checked PeopleSoft and found no reason why ██████████'s dues were not deducted.  Un. Ex. 5.  ██████████ (aka ██████████)[10] signed another dues card in February 2017, but Host did not start deducting his dues until April 2017.  *See* Appx. B.

- ██████████ signed a dues card in July 2016, but Host did not start deducting her dues until April 2017.  *See* Appx. B.

- ██████████ signed a dues card in May 2016, but Host never deducted her dues.  *See* Appx. B.

- ██████████ signed a dues card in January 2017, but Host did not start deducting her dues until April 2017.  *See* Appx. B.

- ██████████ signed a dues card in May 2016 but Host did not start deducting her dues until April 2017.  *See* Appx. B.

---

[10] We know this is the same person because the social security number is the same.

**Exhibit 2**
**2-34**

- ████████████ signed a dues card in December 2017, but Host did not start deducting her dues until February 2018.  *See* Appx. B.

- ████████████████ signed a dues card in March 2017, but Host never deducted his dues.  *See* Appx. B.

- In March 2018, Angelina Preston admitted that she had no explanation for why ██████████'s dues were not deducted.  Un. Ex. 18.

- Host deducted September and October 2016 dues from 95 of the former CMS employees, but then failed to continue deducting dues from those employees' wages in later months.

There are likely many more instances, but it is impossible for Local 11 to identify them all.

Local 11 cannot do so because Local 11 does not have all the dues cards.  Host agreed to give Local 11 copies of all dues authorization cards, Jt. Ex. 5, at ¶ 3(b); *see also* Un. Ex. 23 (¶ 1(e)); but Host produced only 552 legible dues cards.  Un. Ex. 27 (amended); Tr.(V) 68-73. There is another reason to believe that Host has not produced all the dues cards that it has.  Host deducted dues from some of the former CMS employees even though it did not produce a legible dues card for those employees. *See, e.g.*, Appendix A (███████████████████ ███████████████████████████████████████ ████████████████████████████); Appendix B (█████████ ██████████████████████████████).  We assume that Host has dues cards for those employees because Host's policy and computer system prohibit dues deduction without authorization.[11]

---

[11] We accept at face value Host's representation that it does not deduct dues from employees' wages unless the employee has authorized Host on a dues card, as it would be unlawful for Host to deduct money from wages without an authorization.  Jt. Ex. 6 (¶ 4).

**Exhibit 2**
**2-35**

It is unsurprising that Host failed to deduct dues even after employees authorized deductions.  Host's computer system (PeopleSoft) deducts dues automatically if a dues card authorization is entered.  Entering the dues cards into PeopleSoft was the responsibility of Host's Human Resources staff, but Host failed to staff that department adequately.  At the same time that Host was running condensed orientations for approximately 250 to 300 former CMS employees, Host also was hiring for its busy summer season.  Tr.(V) 7, 45-46.  The Human Resources Manager at LAX turned over constantly, leaving the position unfulfilled at the time. Between August 2016 (when Host acquired CMS) and December 2017, Host employed three people in the position of LAX Human Resources Manager: Ava White (until September 2016), Faith Baaadamoko (November 2016 to September 2017) and Natalie Ramirez (October or November 2017 to December 2017).  In addition, Cindy Yasuda, Jeff Pantel and Angelina Preston did the Human Resources Manager's work when the position was vacant.  Tr.(II) 127-29, 142, 150-51; Tr.(V) 60-61.  This understaffing caused problems.  Host's Senior Director of Labor Relations admitted as much.  Asked about Human Resources Manager Faith Baaadamako's performance, he responded:

> Faith had only been there, I don't know, less than a year at that point, was trying to figure it all out.  It's a very busy, dynamic, large branch, lots of turnover.  She was doing the best she could and was put into a difficult situation.  So I don't have any issues with her.  She was doing the absolute best job she could.  But, again, she was relatively new and was trying to figure out a mess.

Tr.(III) 68.

### 2. Host failed to present dues cards to employees and assist employees to complete the cards.

In Article 2.7 of the Collective Bargaining Agreement, Host agreed "to provide, assist in the completion of, and remit any forms necessary to perfect membership in Local 11."  Jt. Ex. 1,

**Exhibit 2**
**2-36**

at 3.  Host has historically complied with this promise by distributing dues cards at new employee orientation and explaining to employees how to complete the cards.  Tr.(V) 24-25.

Host might not have presented cards to the CMS employees to sign.  For example, former CMS employee Elvia Cristina Martinez Hernandez went to orientation before the CMS acquisition and signed whatever papers were given to her.  She also completed new hire paperwork a second time when she returned from leave in November 2016.  As a union leader, Martinez Hernandez would have signed a dues card if it was presented to her, but Host did not deduct dues from Martinez Hernandez's wages.  In February 2017, Human Resources Manager Faith Baaadamako told Martinez Hernandez that Host did not have a dues card for her.  Tr.(II) 187-93.  We don't know whether Host distributed dues cards at the orientation sessions for the former CMS employees or at other time.  In October 2017, Angelina Preston promised to deduct dues arrears from the former CMS employees, Un. Ex. 14; suggesting that Host had dues cards signed by those employees.  But in February 2017, Faith Baaadamako told Carolina Simmons that she did not have any dues cards for the former CMS employees.  Un. Ex. 6.  Preston, who was Host's witness about the orientations it held for the former CMS employees, did not know whether dues cards were distributed in those orientation sessions or any other time.  Tr.(II) 140-42.

What we do know is that it would be unusual if large numbers of the former CMS employees had declined to sign dues cards.  Employees are not required to authorize dues deduction, but the overwhelming majority do so even without Local 11's representatives speaking to employees at orientation sessions.[12]  Tr.(I) 168; Tr.(II) 95-96, 112-13, 119-20; Jt. Ex.

---

[12] Host faults Local 11 for not attending the orientation sessions, as the Collective Bargaining Agreement permits.  This is not an argument that helps Host's case.  It does the opposite.  The

**Exhibit 2**
**2-37**

6, at ¶ 1.  Tr.(I) 82; Tr.(II) 146-48.  Host's Senior Director of Labor Relations knows of just three Host employees anywhere in the country who chose not to authorize dues deduction, and they were in Charlotte, Phoenix and Boston.  Tr.(III) 57-58.  No one from Host has ever told Local 11 that more than a few employees did not want to sign dues cards.  Tr.(I) 82; Tr. (II) 146-47.  This is to be expected.  Dues payment is a condition of employment, and payment through automatic deduction is far more convenient than bringing cash to the union office or sending a check each month.  Tr.(II) 235-36.

When Host complies with its obligations under Article 2.7, Local 11 receives dues through wage deductions from most or all employees.  It is reasonable to infer that Host did not present the dues cards to the former CMS employees.

### 3.      Host has the burden of proving that it complied with Articles 2.7 and 2.10.

Burden-shifting aids the search for truth and prevents the party with the best access to relevant evidence from benefiting by not presenting that evidence:

> [I]t is well-known that arbitrations are not subject to legal rules of evidence and that, even if they were, the burden of proof is not necessarily on the Union in non-disciplinary cases.  In many instances the only party to an arbitration who is in position, having supervisory control as well as control of records and other data, to present detailed and relevant evidence, is the Company.  In such instances it behooves Company, once Union has made a prima facie case, to come forward with evidence rebutting Union's claim.

*Mueller Co.*, 51 LA 428, 434 (Whyte, 1968); *see also Chicago Transit Authority*, 135 LA 1579, 1591 (Wolff, 2015) (presuming that grievant misused leave and shifting the burden to the union to rebut that presumption); *Coreslab Structures (L.A.), Inc.*, 115 LA 997, 1000 (Gentile, 2001) (applying the doctrine of *res ipsa loquitor* to infer negligence and shift the burden of proof to the

Agreement requires Host to "advise Local 11 of the time and date" that orientation sessions will be held, Jt. Ex. 1, at 4 (Art. 2.17); but Host has failed to do so.  Tr.(I) 168; Tr.(II) 102, 119-20.

**Exhibit 2**
**2-38**

union).  Drawing an adverse inference from a party's failure to present evidence is another tool that arbitrators use to find the truth.  Kenneth May, ed., *Elkouri & Elkouri: How Arbitration Works*, at 8-51 (8th ed. 2016) ("The failure of a party to call as a witness a person who is available to it and who should be in a position to contribute informed testimony may permit the arbitrator to infer that had the witness been called, the testimony adduced would have been adverse to the position of that party."); Marvin F. Hill and Anthony V. Sinicropi, *Evidence in Arbitration* 102 (BNA 1994) ("Arbitrators have declared that an adverse inference may be drawn from a party's failure to call a potential witness.")

The evidence described in the preceding two subsections create an inference that Host failed to comply with its dues-deduction obligations.  Host is in the best position to explain why dues were not deducted.  Local 11 is not.  Accordingly, the burden should shift to Host to show that it was not at fault.

It would have been easy for Host to determine what went wrong.  Carolina Simmons first asked about dues deductions from the former CMS employees' wages in October 2016, which was just a few months after Host hired those employees and held orientation sessions for them. Un. Ex. 14.  At that time, Host could have checked its computer system to determine if dues deduction forms had been entered for those employees and if not, asked the Human Resources staff whether they presented the employees with dues cards and assisted in completion of those cards.  If Host's staff failed to do so, Host could have then held a meeting for those employees to present the dues cards.  If Host's staff responded that they had presented the cards, Host could have followed up by asking whether employees chose to complete dues cards and if so, what was done with the completed dues cards.  Host's practice is to store a paper copy of each dues card in employees' personnel files and also enter the dues-deduction authorization into its computer

**Exhibit 2**
**2-39**

system (PeopleSoft). Host could have generated a list of all employees for whom PeopleSoft reflected that dues deduction had not been authorized. Host then could have checked the personnel files for hard copies and if it did not find the cards in those locations, asked responsible Human Resources staff why not. Host failed to take any of these simple steps or call as witnesses any of the Human Resources staff who ran the orientations or were responsible for processing the dues cards after those orientiatons.

**C.     Host's long list of defenses amount to nothing.**

   **1.     Article 2.12 does not require Local 11 to seek the back dues from employees instead of Host.**

Host relies on the sentence in Article 2.12 that reads, "This provision does not affect the obligations of the employees under this Article." Jt. Ex. 1, at 3. Host says that this sentence, together with the "union security" [13] obligation in Article 2.2 to 2.4, means that employees are always responsible for unpaid dues even if Host failed to give them dues cards and assist with completing the cards (in violation of Article 2.7) or if Host failed to deduct dues from their wages even though employees signed a dues cards (in violation of Article 2.10). Host is reading more into the sentence than is there.

The sentence in Article 2.12 to which Host attaches its argument suggests that Local 11 or Host could have attempted to extract the back dues from employees. The "obligations of the employees under this Article" does refer to employees' obligation to become members of Local

---

[13] Section 8(a)(3) of the National Labor Relations Act permits a union and an employer to agree that being a union member is a condition of employment. 29 U.S.C. § 158(a)(3). Local 11 and Host made such an agreement. Jt. Ex. 1, at 2 (Arts. 2.2 & 2.3). An employee becomes a member of Local 11 by paying the initiation fees and dues that Local 11 requires. Jt. Ex. 1, at 2 (Art. 2.4); *see also* Un. Ex. 3 (required dues and initiation fees). "Union security" is labor law's term for this type of agreement, but the Collective Bargaining Agreement uses the term more broadly. Article 2 and Article 2, Subsection A are both titled "Union Security", but the remaining subsections of Article 2 address other topics.

**Exhibit 2**
**2-40**

11.  When employees don't become members by paying dues, they haven't satisfied a condition of employment.  But terminating those employees would not have remedied the problem that Local 11 raised in this grievance: the loss of dues income caused by Host's failure to deduct such dues.  Article 2.12 also states that if Host "fails to collect or pay over such dues pursuant to this Article, Host shall be liable for regular dues and initiation fees which Local 11 loses by reason of Host's failure."  Jt. Ex. 1, at 3.  In other words, Article 2.12 gives Local 11 two options.  It can seek to recover damages from Host through the grievance process, or it can try to compel employees to pay the back dues that have built up by threatening those employees with discharge if they don't pay.

Local 11 had good reasons for choosing not to threaten employees.  It is likely that some employees would pay and others would not, so threats would not necessarily accomplish what Local 11 seeks.  Once employees cease working for Host, Local 11 has no way to collect money from them.  Tr.(II) 239-40.  It is not employees' fault that Host failed to deduct their dues.  Host either failed to give them dues cards to sign or disregarded the dues card that they did sign.  A wealthy person might view a delay in collection as a financial boon.  But Host's employees are not highly paid.  *See* Jt. Ex. 1, at 6 (wage scale).  Many live hand-to-mouth and don't have large savings accounts.  They spend their paychecks when they receive them, so paying dues each month by dues deduction is easier than paying months of arrears.  Tr.(II) 238-39.  Moreover, if employees pay Local 11 the back dues that have accrued upon threat of discharge, they will likely feel resentment toward Local 11, particularly if they authorized dues deduction.  Tr.(II) 239.

Article 2 allows Local 11 to elect its remedy.  Local 11 has chosen to seek damages from Host.

**Exhibit 2**
**2-41**

**2.      The Union's record-keeping is not the problem.**

In his "evolving" hearing presentation, Host's counsel questioned the accuracy of Local 11's record-keeping.  He questioned whether Local 11 kept accurate records of the monthly ACH bank transfers from Host, why Carolina Simmons removes some of the information contained in the Dues Reports before uploading the relevant information to TIMMS, and why one witness mistakenly referred to ".prn" files as ".csv" files.  The Arbitrator must have been wondering how Host's counsel would connect all of the testimony elicited through his cross-examinations.  It amounted to nothing.  It was just a fishing expedition in hopes of finding a way to pin the blame on Local 11 for Host's mistakes.  No flaws in Local 11's record-keeping could ever justify Host's failures to distribute dues cards, assist in their completion and/or deduct dues in accordance with employees' authorizations.

**3.      Labor law's anti-bribery statute does not prohibit a monetary remedy to Local 11.**

As a remedy, Local 11 seeks an award of lost dues.  In the "Remedy" Section, we describe the requested remedy in detail and explain why it is appropriate.  Before we do that, we respond to Host's argument against a monetary remedy.  Host asserts that the Arbitrator cannot lawfully require Host to pay money to Local 11 to compensate Local for dues that were not deducted from employees' wages.  Host claims that such an award would violate § 302 of the Labor Management Relations Act, 29 U.S.C. § 186.  Host is wrong.

Section 302 is an anti-bribery law.  Its main provisions prohibit employers from giving to unions, and unions from receiving from employers, things of value.  29 U.S.C. § 186(a), (b).  But the statute also creates exceptions to this general rule.  One exception legitimizes the dues deduction system to which the parties agreed in the Collective Bargaining Agreement.  It allows employers to give union money deducted from employees' wages pursuant to written

**Exhibit 2**
**2-42**

authorizations.  29 U.S.C. § 302(c)(4).  Another exception allows arbitrators to order employers

to pay unions money damages.  29 U.S.C. § 302(c)(2).  That exception permits an arbitrator to

remedy an employer's failure to comply with a dues deduction agreement by ordering the

employer to pay the union money the union lost as a result of the employer's breach.

*Washington Post v. Washington-Baltimore Newspaper Guild,* 787 F.2d 604, 606-07 (D.C. Cir.

1986) (rejecting employer's argument that the award violated § 302); *Steelworkers v. United*

*States Gypsum Co.,* 492 F.2d 713, 734 (5th Cir. 1971) ("Since the purpose of § 302(a) is to

protect employers from extortion and to insure honest, uninfluenced representation of

employees, and in view of the exclusion from its coverage an arbitrator's award, we hold that §

302(a) does not render the arbitrator's award here unenforceable.  Nor can we say that the

arbitrator's decision requiring the company to pay the award without recoupment from its

employees is not within his remedial authority."); *see also Humility of Mary Health Partners v.*

*Teamsters Local 377,* 296 F.Supp.2d 840, 846 (N.D. Ohio 2003) (§ 302(c)(2) "affords an

arbitrator with the power to issue an award requiring an employer to make monetary payments

directly to the union for prior breaches of a valid checkoff dues provision"); *Monroe Lodge No.*

*770 v. Litton Business Systems, Inc.* 334 F.Supp. 310, 316 (W.D. Va. 1971) ("In light of this

breach, the Union is entitled to reimbursement for dues which the Company failed to deduct and

remit to the Union.")

It makes no difference whether Host violated the Collective Bargaining Agreement by

failing to deduct dues that employees authorized or by failing to distribute dues cards to

employees and assist in their completion.  In *Washington Post*, *supra*, the employer argued that §

302's exceptions permit an award of money damages only when the employer fails to comply

with dues deduction authorizations but not when employees have not given such authorization.

**Exhibit 2**
**2-43**

The Court of Appeals rejected this argument, explaining that "[i]f any one of [§302(c)'s] exceptions applies, the general prohibition of § 302 does not operate." 787 F.2d at 606.  The Court also reject that the award was inconsistent with § 302's purpose: "The Post will pay this money on the order of the arbitrator, after vigorous and genuine litigation.  No reasonable view of these facts suggests any improper influence."  *Id.* at 607.  That is also true here.

**4.      Host does not have a timeliness defense.**

Host says that Local 11 did not timely file this grievance.  Tr.(I) 8-9.  There are four problems with this argument.

First, Article 2 establishes a specific rule relating to dues deduction violations.  It says that "[t]he Employer is not liable for any mistakes related to this Article which are not brought to its attention in writing within three years."  Jt. Ex. 1, at 3 (Art. 2.10).  The implication of this sentence is that Host is liable for mistakes that Local 11 brings to its attention within three years. *Elkouri & Elkouri: How Arbitration Works*, at 9-41 ("Unless a contrary intention appears from the contract interpreted as a whole, or from the relevant extrinsic circumstances, more specific provisions should restrict the meaning of a general provision.")

Second, the CBA does not establish any timeline for Local 11 to file grievances about contract interpretation.  Article 10.2 sets a time limit for grievances that begin at "Step One", which is "fifteen days of the occurrence or of the time the Grievant should have reasonably had knowledge of the occurrence which gave rise to the grievance."  Jt. Ex. 1, at 17.  But this grievance did not begin at Step One because it is a contract interpretation grievance.  *See* Jt. Ex. 1, at 17 (Article 10.2, "All . . . disputes of contract language shall begin at Step Two.").  The deadline to move a grievance to Step Two is "within ten days of the Step One meeting."  But since there was not a Step One meeting, that time will never begin to run.

**Exhibit 2**
**2-44**

Third, even if the Step One timeline (fifteen working days)[14] applied, that time limit only began to run at the time Local 11 "should have reasonably had knowledge of the occurrence which gave rise to the grievance." Carolina Simmons notified Host's Human Resources staff of the problem promptly, and Host's staff repeatedly promised to resolve it. *See, e.g.*, Un. Exs. 5, 6, 8(a), 14. Local 11 was justified in relying on their promises. Local 11 waited to file the grievance until it knew that Host's managers were making empty promises.

Fouth, Host waived this argument by not raising it during the prior steps of the grievance process. Tr.(I) 209-10. "[I]f an arbitrator is able to hold that the parties have waived time limits set forth in the collective bargaining agreement, the arbitrator will do so, as the arbitral preference is to resolve disputes on the merits rather than dismiss on procedural grounds." Ray J. Schoonhoven, Ed., *Fairweather's Practice & Procedure in Labor Arbitration*, at 125 (4th ed. 1999); *see also Elkouri & Elkouri: How Arbitration Works*, at 5-10 ("A general presumption exists that favors arbitration over dismissal of grievances on technical grounds."). Arbitrators routinely deny timeliness defenses if the party asserting the defense did not raise it in prior steps of the grievance process. *See, e.g.*, *Trinity Industries, Inc.*, 109 LA 86, 95 (1997) (stating that the "right to request enforcement of time limits may be waived by . . . failing to raise the timeliness issue until the arbitration hearing"); *Moon Fabricating Corp.*, 95-1 ARB ¶ 5080 (Ferree, 1994) (objection to timeliness waived when not mentioned in the preliminary steps); *James River Corp., Consumer Prods.*, 94-2 ARB ¶ 4529 (Overstreet, 1994) (a party can waive right to assert timeliness defense by not raising the objection at every step of the proceeding); *Union Eye Care Center, Inc.*, 100 LA 703, 704 (Shanker, 1993) ("failure to promptly object to timeliness, and . . .

---

[14] "Days" does not include Saturdays, Sundays or holidays. Jt. Ex. 1, at 17 (Sec. 10.4).

**Exhibit 2**
**2-45**

going forward with the grievance procedures amounts to a waiver of the procedural time requirements"). This waiver rule deters sandbagging and applies squarely to this case.

### 5. Local 11 was not required to file hundreds of separate grievances.

Host's counsel also asserted that Local 11's grievance must be dismissed because Local 11 filed one grievance about Host's failure to deduct dues instead of filing hundreds of grievances. Tr.(I) 8. This argument is silly. "It is widely accepted that a union has standing to file a group grievance that affects a significant portion of the bargaining unit." *Elkouri & Elkouri: How Arbitration Works*, at 5-20. Nothing in the Collective Bargaining Agreement suggests that Local 11 must file multiple grievances about an ongoing or widespread problem, and doing so would not make sense. The whole point of having a grievance process in collective bargaining agreements is to resolve disputes efficiently. The rule that Host's counsel advocates would remove any efficiency from the process. In any event, Host waived this argument also by not raising it during the grievance process. Tr.(II) 210.

### 6. Local 11 did not abandon this grievance in bargaining.

Host seems to think that Local 11 should have resolved the issues in this case in collective bargaining. That does not make sense. The Collective Bargaining Agreement between Host and Local 11 runs from October 1, 2015 to September 30, 2018. Jt. Ex. 1, at 28. This dispute did not arise until 2016.

Host claims that the collective bargaining agreement between CMS and Local 11 (Joint Exhibit 4) continued to apply to the former CMS employees, even after Host hired them. That also makes no sense. Host did not make an agreement with either Local 11 or CMS to assume

**Exhibit 2**
**2-46**

CMS's rights and obligations under that agreement.[15]  Moreover, the Collective Bargaining Agreement between Local 11 and Host covered the employees in the former CMS outlets as soon as Host employed them because that Agreement covers all Host employees working at LAX in the listed classifications.  Jt. Ex. 1, at 1 (Art. 1.1).

**Remedy**

Article 2.12 of the Collective Bargaining Agreement contemplates a monetary remedy: "If an Employer has agreed to the deduction of dues pursuant to this Article and fails to collect or pay over such dues pursuant to this Article, Host shall be liable for regular dues and initiation fees which Local 11 loses by reason of Host's failure."  Jt. Ex. 1, at 3.  Thus, as a remedy, Host should be required to pay Local 11 the dues Local 11 has not received as a result of either (a) Host's failure to distribute and assist employees in the completion of dues cards; or (b) Host's failure to deduct dues in accordance with employees' authorizations.  Host should also be required to pay Local 11 pre-award and post-award interest at the federal rate on this money.  Local 11 requests that the award specify that Host may not attempt to recoup any of this money from employees.

As discussed at the hearing, the parties do not expect the Arbitrator to identify all of the employees for whom dues to be deducted and calculate the amount owed.  For this reason, they agreed that the Arbitrator would retain jurisdiction over the implementation of any remedy. Tr.(I) 6.  What the parties do seek in the award is guidance about how to calculate the amount due.  Local 11 proposes the following instructions.

---

[15] The collective-bargaining agreement between CMS and Local 11 lists Host on its cover as a signatory, but the parties agree that this was an error, and Host was not a party or a joint employer with CMS.  Tr.(II) 92-93; 135; Tr.(III) 52.

**Exhibit 2**
**2-47**

1.  Host shall pay Local 11 the dues and fees owed by any employee for whom Local 11 or Host has a dues card authorizing deduction, beginning on February 1, 2016 or the dues card date, whichever is later, unless Host actually deducted dues or the employee had no net wages after taxes from which to deduct dues.  To identify these employees, Host should be ordered to present legible copies of the dues cards that were illegible when it produced them pursuant to Joint Exhibit 5; and to conduct a review, with Local 11's assistance, of the personnel files for all employees employed between February 1, 2016 and the present to determine if Host has any additional dues cards.

2.  Host shall pay Local 11 the dues and fees owed by any employee from whose October 2016 wages Host deducted September and October 2016 dues, as reflected on Union Exhibit 12(b), but thereafter failed to continue deducting dues, unless the employee had no net wages after taxes from which to deduct dues.

3.  Host shall pay Local 11 the dues and fees owed by any former CMS employee, unless (a) Host presents specific evidence that Host presented the employee with a dues card and the employee chose not to authorize dues deduction; or (b) the employee did not authorize dues deduction while employed at CMS (creating an inference that the employee would have declined to authorize dues deduction if presented a dues card); or (c) the employee had no net wages after taxes from which to deduct dues.

Local 11 proposes that the remedy period run from February 1, 2016.  Local 11 is permitted to seek back dues for up to three years before it brought an error to Host's attention in writing.  *See* Jt. Ex. 1, at 3 (Art. 2.10) ("Host is not liable for any mistakes related to this Article which are not brought to its attention in writing within three years.")  Local 11 is willing to limit the start date to February 1, 2016 (just over one year before the grievance was filed) which is the

**Exhibit 2**
**2-48**

time period for which the parties agreed in the prearbitration agreement to exchange information (Joint Exhibit 5, at ¶¶ 1, 2).

Host's liability should continue until Host begins deducting dues from the employee's wages or the employee declines to authorize dues deduction after being presented a dues card. Host might claim that its liability ended in October 2017 because that is the end date in the pre-arbitration agreement to exchange information.  The October 2017 date was used in that agreement because the parties made that agreement on October 2017.  They could not exchange information about what might happen in the future.  Moreover, they specifically agreed that "neither party waives any position it might take in arbitration, including that the relevant time period is different than the one stated above."  Jt. Ex. 5, at ¶ 4.

### Conclusion

For all of the foregoing reasons, Local 11's grievance should be sustained and the requested remedy awarded.

> _Kristin L. Martin_
> Kristin L. Martin
> McCRACKEN, STEMERMAN & HOLSBERRY, LLP
> 595 Market Street, Suite 800
> San Francisco, CA 94105
> Telephone: 415-597-7200
> Fax: 415-597-7201
>
> _Attorneys for UNITE HERE Local 11_

Signed and dated this 15th day of October, 2018.

**Exhibit 2**
**2-49**

Appendix A

| Name on Dues Reports (UX 12, 12b) | Name on UX 14 | Employment Status as of October 2017 (UX 11 & 20) | Dues Card produced by Host (UX 27 amended) | Dues Card Shown on Jointly Compiled Charts | Oct. 2016 payment of Sept & Oct. dues (UX 12b) | Nov. 2016 dues report includes payment of Sept & Oct Dues (UX 12) | Nov. 2016 dues paid per Nov. dues report | Dec. 2016 dues paid per Dec. dues report | Jan. 2017 dues paid per Jan. dues report | Feb. 2017 dues paid per Feb. dues report | Mar. 2017 dues paid per Mar. dues report | April 2017 dues paid per April dues report | May 2017 dues paid per May dues report | June 2017 dues paid per June dues report | July 2017 dues paid per July dues report |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ | | term. 12/20/16 | no | 8/2/16 (UX 20) | yes | no | no | no | not empld. | not empld. | not empld. | not empld. | not empld. | not empld. | not empld. |
| ■ | same | active | no | 8/3/16 (UX 11) | yes | no | no | no | no | no | no | no | no | no | no |
| ■ | same | term. 5/1/17 | no | 4/15/14 (UX 20) | yes | no | no | no | no | no | no | no | not empld. | not empld. | not empld. |
| ■ | same | term. 12/29/16 | no | no | yes | no | no | no | not empld. | not empld. | not empld. | not empld. | not empld. | not empld. | not empld. |
| ■ | same | term. 9/4/17 | no | no | yes | no | no | no | no | no | no | no | no | no | no |
| ■ | | active | no | no | no | yes | yes | yes | yes | yes | yes | yes | yes | yes | yes |
| ■ | same | active | no | no | no | yes | yes | yes | yes | yes | yes | yes | yes | yes | yes |
| ■ | | active | no | no | no | yes | yes | yes | yes | yes | yes | yes | yes | yes | yes |
| ■ | | active | no | no | no | yes | yes | yes | yes | yes | yes | yes | yes | yes | yes |
| ■ | same | active | no | no | no | yes | yes | yes | yes | yes | yes | yes | yes | yes | no |
| ■ | | yes | no | no | no | yes | yes | yes | yes | yes | yes | yes | yes | yes | yes |
| ■ | | term. 5/2/17 | no | no | no | yes | yes | yes | yes | yes | yes | yes | yes | not empld. | not empld. |

**Exhibit 2**
**2-50**

Appendix B

| Name | Employment Status as of October 2017 (UX 11 & 20) | Dues Card Produced by Host (UX 27) | Dues Card Shown on Jointly Compiled Charts | Date Local 11 Contacted Host | First Month-Year Dues Deducted Per Dues Reports (UX 12) |
|---|---|---|---|---|---|
| ███ | Active | 2/29/2017 | | 11/15/2016 (UX 5) | April-17 |
| | Active | | 7/13/2016 (UX 11) | 12/9/2016 (UX 5) | April-17 |
| | Term. 1/12/17 | | 5/31/2016 (UX 20) | 12/15/2016 (UX 5) | never |
| | Active | 3/16/2017 | | 2/8/2017 (UX 6) | April-17 |
| | Active | 1/11/2017 | | 2/8/2017 (UX 6) | April-17 |
| | Active | | 5/19/2016 (UX 11) | 2/8/2017 (UX 6) | April-17 |
| | Term. 4/11/17 | | | 2/8/2017 (UX 6) | April-17 |
| | Term. 9/11/17 | 3/21/2017 | | 2/8/2017 (UX 6) | April-17 |
| | Active | 12/4/2017 | | 6/20/2017 (UX 9) | February-18 |
| | Active | 3/23/2017 | | 8/15/2017 (UX 16) | never |

**Exhibit 2**
**2-51**

# Exhibit 3

Exhibit 3
3-52



| | |
|---|---|
| In the Matter of Arbitration Between | ) **BEFORE ARBITRATOR** |
| | ) **GUY PRIHAR** |
| UNITE HERE! LOCAL 11 | ) **FMCS#-170427-53773-A** |
| | ) |
| and | ) |
| | ) |
| | ) **POST-HEARING BRIEF ON BEHALF OF** |
| HOST INTERNATIONAL, INC. | ) **HOST INTERNATIONAL INC. TO DENY** |
| | ) **THE GRIEVANCE FILED BY ALL** |
| (LAX Union Dues) | ) **AFFECTED EMPLOYEES OF THE UNION** |
| | ) **REGARDING DUES DEDUCTIONS** |
| | ) |
| | ) |
| | ) |

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-53**

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION: ..................................................................................... 4

II. ISSUE PRESENTED:................................................................................ 9

III. RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING
AGREEMENT (JX 1) .............................................................................. 10

IV. THE ARBITRATION HEARING, THE WITNESSES AND THE
BARGAINING UNIT:.............................................................................. 12

V. STIPULATED FACTS  (JX 6):............................................................... 13

VI. THE FACTS: .......................................................................................... 14

    1. The Onboarding Process for New Hires of HMS Host........................... 14

        a. The Hiring Process.................................................................... 14

        b. The Security Clearance Process at LAX.................................... 14

        c. New Hire Orientation................................................................ 15

            i. The Union's Testimony .................................................... 15

            ii. The Company's Testimony ............................................... 16

        d. The Union's Receipt of Dues Authorization Forms for New Members...................... 18

        e. The Union's Alternative Methods for Determining New Hires................................. 18

    2. The Dues Deduction Process for Employees of HMS Host. ........................................... 19

        a. The Union's Receipt of Dues Deductions via Wire Transfer and the Company's
Corresponding Dues Reports ................................................... 19

        b. The Union's Generation of Missing Payment Reports.............................. 20

        c. The Company's Response to the Union's Missing Payment Reports.......................... 22

        d. The Union's Dues Policy and its Lax Enforcement of the Union Security Clause...... 23

    3. The Parties Negotiation of the Current Collective Bargaining Agreement. ..................... 24

    4. HMS Host Acquires CMS' Contracts for LAX Concessions in August 2016 ................. 24

    5. Dues Arrears Resolved by the Parties in October 2016.......................................... 24

    6. The Union Files a Grievance on Behalf of All Affected
Employees Who Have Allegedly Not Had Dues Deducted............................................. 25

1

**Exhibit 3**
**3-54**

a. The Union Learns of the Allegedly Outstanding Dues Deductions in Late 2016. ........................................................................................ 25

b. The Union Files the Instant Grievance and Rejects the Company's Proposals to Resolve It.................................................................... 27

7. The Parties Participate in Mediation and Enter into an Agreement to Share Information. ........................................................ 29

8. The Company's Analysis of the Union's Grievance. ..................................... 29

VII.   ARGUMENT:.......................................................................................... 31

1. The Union's Grievance Must Be Denied Because the Agreement Does Not Support the Filing of Class Action Grievances............................ 31

2. Article 2.12 of the CBA is Unlawful Because it Violates the Labor Management Relations Act................................................................... 33

3. The Union's Claims for Outstanding Deductions Occurring More Than Fifteen Days Before the Grievance Was Filed Are Untimely. ............... 35

4. Assuming Arguendo the Union's Grievance is Arbitrable and Timely, it Still Fails Because the Union Did Not Satisfy its Burden of Proof that the CBA Was Violated by the Company. .................................................. 37

i. The Company Cannot Be Held Responsible for Any Outstanding Dues of Former CMS Employees That Were Incurred Prior to August 20, 2016....................................................... 37

ii. The Company Complied with Section 2.7 of the Agreement and Cannot Be Held Responsible for Employees Who Never Signed An Authorization Form................................................. 38

1. The Company "Provided" Employees with UX 1 ............................. 39

2. The Company "Assisted in the Completion" of UX 1......................... 40

3. The Company "Remitted" all Completed Forms of UX 1 in Its Possession During the Relevant Period ...................................... 41

iii. Article 2.12 Does Not Relieve "Employees" Who Provided the Company with Signed Authorization Forms of Their Obligation to Remain in Good Standing.................................................. 42

1. The Union's Interpretation of Article 2.12 is Incapable of Harmonizing the Remaining Provisions Contained in Article 2 and Leads to Absurd Results............................................................. 42

2. The Company's Interpretation Dictates That It Is Not Personally Liable for the Outstanding Dues of Both Active and Terminated Employees. ........................................................ 46

2

Exhibit 3
3-55



iv.  Assuming Article 2.12 is Ambiguous, the Union's Claim
     Still Fails Because Past Practice Dictates that the Company
     Should Not Be Personally Liable...........................................................46

5.  The Union's Claim That The Grievance Should Be Sustained
    Because the Company Allegedly Failed to Provide a Written
    Response at Step 2 is Absurd and, If Accepted, Would Amount
    to a Forfeiture..................................................................................47

VIII.  CONCLUSION:.................................................................................48

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

Exhibit 3
3-56

## I.   INTRODUCTION:

This brief is submitted on behalf of Host International Inc. ("Company" or "HMS") in support of its position that the class action grievance filed by UNITE HERE! Local 11 ("Union") on behalf of "all affected employees" in the bargaining unit alleging that: (1) the Company is personally liable for all outstanding dues; and (2) the Company failed to comply with Article 2.7 of the Agreement because it failed to "provide," "assist in the completion of," and "remit" dues authorization forms.  Both of these claims have absolutely no merit..

However, before even reaching the merits of the grievance, it must be denied because it fails to survive three threshold issues.  Indeed, each of the following threshold issues presents an independent basis for denying the grievance: (1) the collective bargaining agreement ("CBA" or "Agreement") does not support the filing of "class action grievances," (2) the language the Union relies upon to hold the Company personally liable for the outstanding dues violates the Labor Management Relations Act ("LMRA") rendering it unlawful, and (3) any claims for outstanding deductions occurring more than fifteen days before the grievance was filed are untimely.

Article 10.2 of the Agreement provides the **exclusive** procedure for filing and processing grievances, however, it has no express support for the filing of "class action grievances" and the Union presented no evidence of any binding past practice indicating otherwise.  This is not surprising given the unique nature of class action claims which are created by the jurisdiction that tries the action and not unilaterally by the statement of one of the parties.  The Union attempts to do just that – it hopes that by simply calling the grievance a "class action" it can ignore the absence of any language in Article 10 supporting its assertion.  This flies in the face of arbitral precedent, as well as the express terms of the Agreement.

In addition to the above, the Union's grievance relies upon contractual language that is unlawful pursuant to 29 U.S.C. § 186.  Indeed, Article 2.12 of the Agreement violates the proscriptions of the LMRA because it arguably compels the Company to act as an insurer and indemnify the Union for any dues that have been "lost."  This provision does not satisfy *any* of the exceptions enumerated in the LMRA and as such, it must be declared unlawful.  While federal courts have ordered employers to directly pay

4

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-57**

1  union outstanding dues, those cases are distinguishable from the present grievance because <u>none of the</u>

2  <u>contract language being scrutinized by the courts imposed</u> **express contractual liability** <u>upon the</u>

3  <u>employer</u>.  The issue here is much narrower because it does not concern the arbitrator's remedial power,

4  rather, it is analogous to a payment *in lieu of dues* which is not supported by law.  This merits denial of

5  the instant grievance because Article 2.12 forms the entire basis of the Union's claim.

6      The last threshold issue provides another procedural hurdle that the Union is incapable of clearing:

7  timeliness.  Article 10.2 of the CBA mandates that all grievances be filed "within fifteen days of the

8  occurrence or of the time the Grievant should have reasonably had knowledge of the occurrence."  The

9  instant grievance was filed on March 15, 2017, yet the Union seeks outstanding dues for deductions that

10  took place as far back as **February 2016.**  These claims are simply not timely; even applying the

11  "knowledge" proviso of Article 10.2, the Union's claims are still untimely because it first brought this

12  issue before the Company on **November 15, 2016** (three months before the grievance was filed).  Either

13  way you cut it, these claims are untimely.

14      Furthermore, the Union will find no refuge in arguing that Article 2.10 provides it with *three* years

15  to grieve dues related issues, or that the claims at issue amount to a "continuing violation" of the

16  Agreement.

17      Article 2.10 makes no reference to the contractual deadline for a filing a *grievance*, instead, it is

18  only concerned with "mistakes" related to deductions.  This language is ambiguous, at best, and there was

19  absolutely no evidence presented by the Union about its intent, let alone what it means in light of Article

20  10.2 (which expressly provides the "exclusive" procedure for filing grievances).

21      The "continuing violation" theory is also deficient, albeit for different reasons.  Arbitral precedent

22  rejects this theory when the underlying grievance is based on various occurrences, each of which constitute

23  a single isolated and completed transaction.  Here, the grievance focuses on instances where dues were

24  allegedly not deducted, as opposed to the paycheck received by the employee every two weeks.  Indeed,

25  it encapsulates alleged violations that occurred *sporadically* over a period of time for a myriad of different

26  reasons, *e..g.*, incomplete dues authorization forms, terminations, leaves of absence, etc.  It would be

27

28

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-58**

1  prejudicial to the Company to group all of these transactions together (for approximately 2,000 employees)

2  and hold the Company responsible for three years with no unifying basis.

3      Nonetheless, even if the Union survives the threshold issues outlined above, the grievance must

4  still be denied because the Union did not satisfy its burden of proof because: (1) the Company cannot be

5  held responsible for any outstanding dues of former CMS employees that were incurred prior to August

6  20, 2016 because HMS was not the employer at that time; (2) the Company complied with Section 2.7 of

7  the Agreement and as such, the Company cannot be liable for employees that neither party has a record

8  of receiving a signed dues authorization form for; and (3) the express language of Article 2.12 does not

9  automatically render the Company personally liable because it does not relieve "employees" from their

10  obligation to remain in good standing.

11      The Union asserts claims for outstanding dues owed by employees working for a competing

12  concessionaire, CMS.  The Company ultimately acquired several CMS leases and hired some of its

13  employees on August 20, 2016.  However, several of the Union's claims seek outstanding dues for these

14  employees that were incurred *prior to the transaction*.  These claims must be rejected because HMS cannot

15  legally deduct dues from employees whom it does not employ and for which it has no dues authorization

16  form.

17      The grievance also asserts a violation of Article 2.7 by claiming that the Company failed to

18  "provide," "assist in the completion of," and remit dues authorization forms.  Reviewing the evidence

19  associated with each of these terms leads to the conclusion that the Union's claim fails.

20      First, none of the Union's evidence supports the assertion that the Company *failed to provide*

21  employees with dues authorization funds, rather, the Union's evidence was limited to whether the

22  Company *failed to deduct dues*.  These are two separate issues with, perhaps, separate obligations.

23  Furthermore, the Union stipulated that its organizers never attended the new hire orientation sessions

24  where the forms were passed out.  The Company, on the other hand, presented credible testimony about

25  its process for providing employees with copies of the forms during the first day of orientation.

26      The phrase "assist in the completion of," falls victim to a similar analysis.  Again, the Union was

27  unable to offer any credible evidencing what actually took place at each new hire orientation meeting and

28

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-59**

1  also stipulated that the Company cannot force employees to complete the form. Thus, the Union has failed

2  to satisfy its burden of proof. Moreover, applying the ordinary and accepted meaning of the undefined

3  term "assist," *i.e.*, "typically doing a share of the work" further strengthens the Company's defense

4  because it provided competent evidence that it provided the form to employees and briefly described its

5  nature. For the Company to engage in any conduct beyond what it typically does would be inconsistent

6  with NLRB precedent.

7    The Union's final claim under Article 2.12 that it failed to "remit" dues authorization forms is also

8  deficient because, again, the Union presented no admissible competent testimony concerning instances in

9  which the Union was <u>missing</u> dues authorization forms because the Company <u>failed to send them to the</u>

10  <u>Union.</u> Moreover, even if the Union had such evidence, it would not be credible because its system for

11  keeping track of new hires is inherently flawed as demonstrated in this hearing. Nonetheless, the Union

12  stipulated that the forms are "periodically" sent to it, and the Company supplemented the record with

13  competent admissible testimony concerning its practice of sending completed authorization forms on a

14  monthly basis, if not more frequently due to mass hiring.

15    The Union's failure to satisfy its burden of proof is fatal to its claim of an alleged violation of

16  Article 2.7. However, the Union's shortcomings on this claim, coupled with the Company's competent

17  evidence is also significant in another sense: <u>it dictates that the Company cannot be held responsible for</u>

18  <u>employees that neither party has a record of receiving a dues authorization form *because* the Company</u>

19  <u>complied with its obligations to "provide," assist in the completion of," and "remit" the forms in question.</u>

20    Last, and perhaps most importantly, Article 2.12 does not render the Company *automatically liable*

21  for any alleged outstanding dues – regardless of whether the employees are active or terminated – as the

22  Union contends. Careful scrutiny of Articles 1.1, 2.12, 2.2 and 2.3 leads to the conclusion that the Union's

23  interpretation fails to harmonize all of these provisions and must be rejected.

24    Indeed, the imposition of liability under Article 2.12 is limited by the following express language:

25  (1) it is only concerned with "<u>employees</u>," *i.e.*, all of the Company's employees working at LAX," as

26  defined in Article 1.1 and referenced throughout Article 2; (2) it does not "<u>affect the obligations of the</u>

27  <u>employees under the Article</u>", *i.e.*, the obligation to remain in good standing pursuant to Articles 2.2 and

28

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-60**

2.3 – this makes direct recovery from the "employees" an option; and (3) the Union can only exercise the alternative option, *i.e.*, direct recovery from the Company, when the Union "<u>loses</u>" the dues due to the Company's failure.

This raises the question, what does the term "loses" mean under Article 2.12. This term is undefined in the Agreement. However, applying its ordinary and accepted meaning, *i.e.*, *to be deprived of or cease to have or retain something*, leads to the conclusion that the dues are only "lost" when the Company <u>refuses</u> to deduct them from the employees.

Therefore, giving effect to each of the provisions referenced above dictates that Article 2.12 can only be interpreted in the following limited sense: (1) outstanding dues owed by "employees" can only be recovered directly from the Company in the event those funds are "lost" because the Company refuses to deduct arears from the employees; and (2) outstanding dues owed by <u>terminated</u> employees cannot be recovered directly from the Company because those individuals are no longer "employees" within the meaning of Article 1.1, *unless those same funds were "lost" while the employees were still working for the Company.*

Applying the above interpretation to the present case leads to an outright denial of the grievance because, the Company offered to resolve the dues arrears in question for <u>active employees</u> via retroactive deductions on multiple occasions and the Union refused. Hence, these amounts are not "lost." Furthermore, there is no evidence in the record that the Company refused to deduct arrears for terminated employees <u>while they were still employed by the Company</u>. Therefore, since those individuals are no longer "employees", the Union's only remaining option is to recover the money directly from them – not the Company.

Nonetheless, even if Article 2.12 is deemed ambiguous, the Company <u>still</u> prevails due to the parties' past practice of retroactive dues deductions for <u>active</u> employees. The parties agreed to retroactive deductions in October 2016 for <u>current</u> employees of CMS that transitioned to Host. Donohoe testified that this practice was not isolated, and the Union never objected or even raised any issue during contract negotiations. Therefore, the Company is not directly liable for the outstanding deductions owed by <u>current</u> employees.

8

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-61**

1   Concerning terminated employees, however, the record is absent of any evidence establishing a

2   legally binding past practice that the Company is personally liable for those dues. Therefore, the Union

3   has failed to sustain its burden of proof in this regard and to rule otherwise would amount to a rewriting

4   of the CBA because it makes absolutely no reference to former and/or terminated employees under Article

5   2.

6   Last, the Union's attempt to argue that the grievance should be sustained due to the Company's

7   failure to provide a written response at Step 2 is absurd. The parties had multiple teleconferences

8   following the Union's filing of the grievance and each time Donohoe clearly articulated the Company's

9   position that it was not personally liable. The Union has suffered no prejudice by failing to receive a

10  written response and to rule in its favor in this manner would amount to a massive forfeiture – something

11  that is strongly disfavored in labor arbitration

12  **II.   ISSUE PRESENTED:**

13  The parties were unable to stipulate at the hearing and submitted their own issues for consideration.

14  The Company submitted the following issues:

15  -   Does the Union have the right to file a class action grievance under the CBA?

16  -   Is the Union's class action grievance timely?

17  -   Is the language of Article 2.12 of the CBA unlawful?

18  -   Did the Company violate the CBA by failing to deduct dues from employees who did not sign

19      a dues deduction authorization form?

20  -   Did the Company comply with its obligation to "assist" the Union pursuant to Article 2 of the

21      CBA? [Vol. 1: 8:15-10:5][1]

22  The Union submitted the following issues:

23  -   Should the grievance be sustained because the Company failed to make a timely written

24      response to Step 2 of the grievance process? If so, what is the appropriate remedy?

25

26

27  [1] There was an official transcript taken of this proceeding. "[Vol.:___]" refers to the particular volume of the transcript
    and "[Tr. ___]" refers to particular pages of the transcript. "[JX ___]" refers to exhibits entered jointly into the record. "[EX ___]"

28  refers to exhibits offered into evidence by the Employer. "[UX___]" refers to exhibits offered into evidence by the Union.

9

**Exhibit 3**
**3-62**

1       -   Did the Company violate Article 2 of the CBA by failing to provide, assist in the completion

2           of, and/or omit Union membership applications and dues check-off authorizations to the

3           Union?

4       -   Did the Company violate Article 2 of the collective bargaining agreement by failing to deduct

5           Union initiation fees and/or monthly dues form the employees' earnings? If so, what is the

6           appropriate remedy?  [*Id*. at 7:14 – 8:11]

**III.    RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT (JX 1):**

**ARTICLE 1 – DEFINITIONS**

1.1  "Employee" or "employees" is defined as all of the Employer's employees at the Los Angeles International Airport within the jurisdiction of the Union and working in those classifications listed in Exhibit "A" hereto, except as modified by the express terms of this Agreement.

**ARTICLE 2 – UNION SECURITY**

…

2.2   All present employees who are not members of the Union on the effective date of this Agreement shall, as a condition of employment, on or before the 31st calendar day following the effective date of this Agreement, become and remain members in good standing of the Union.

2.3  All new employees hired on or after the effective date of this Agreement shall, as a condition of employment, on or before the 31st calendar day following the beginning of such employment, become and remain members in good standing of the Union.

…

2.7  The Employer agrees to provide, assist in the completion of, and remit any forms necessary to perfect membership in the Union.

…

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-63**

2.10   The Employer agrees to deduct Union initiation fees and monthly dues from employees' earnings as required.   Deduction shall be authorized in writing by the employees on Dues Deduction Authorization and Assignment forms supplied by the Union.   The Employer shall furnish the Union on a monthly basis a record of those employees for whom deductions have been made and the amount of those deductions.   Said deductions shall be made from the last payroll period of each month and shall be deposited directly into the Union's bank account not later than the 15th day of the following month.   The Employer is not liable for any mistakes related to this section which are not brought to its attention in writing within three years.   The reports described shall be sent in Excel format to the Union via e-mail, on a CD Rom, or 3.5 inch diskette.

…

**D. Union Dues Authorization**

2.12  The Union shall hold the Employer harmless on account of any liability, claim, suit or dispute arising out of the collection of moneys under this Article including the reasonable cost of any defense made necessary by any such liability, claim, suit or dispute.   If an Employer has agreed to the deduction of dues pursuant to this Article and fails to collect or pay over such dues pursuant to this Article, the Employer shall be liable for regular dues and initiation fees which the Union loses by reason of the Employer's failure.   This provision does not affect the obligations of the employees under this Article.

…

**ARTICLE 10 – GRIEVANCE PROCEDURE**

10.1  A grievance is hereby defined as any claim or dispute between the Employer and the Union or between the Employer and any employee which involves interpretation, application or enforcement of this Agreement disputed between the parties.   Employees awaiting the outcome of a grievance or arbitration are to continue to follow the rules and instructions of the Employer in the interim.

10.2  All grievances must be filed and processed in accordance with the following exclusive procedure:

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-64**

Step 1.  The employee or Union that has a grievance shall discuss his Grievances with his supervisor or the Manager within fifteen days of the occurrence or of the time the Grievant should have reasonably had knowledge of the occurrence which gave rise to the grievance.  The Grievant has the right to request the presence of a Union Representative at this Step One meeting.  Similarly, Employer grievances must be discussed with the Union within said fifteen days.

Step 2.  If the grievance is not settled in the Step One meeting, the grievance may be appealed by the employee or the Union to Step Two by filing a written grievance with the General Manager or his designated representative within ten days of the Step One meeting.  Each written grievance must set forth the facts giving rise to it, any additional facts relied upon, the Section or Sections of the Agreement alleged to have been violated and the remedy or correction desired.  Within five days after the filing of the written grievance, the General Manager or his designated representative will meet with the Union in an attempt to settle the grievance.  The Company shall submit a written response to the grievance within ten days of the Step Two meeting.  All termination grievances and disputes of contract language shall begin at Step Two.  Similarly, Employer grievances at Step Two shall be filed with the Union President, with the same requirements to be followed.

…

10.4  Time Limits.  If the Union or the employer does not file the written grievance within the time limits set forth in Step Two, the grievance shall be considered settled on the basis of the last disposition by the responding party.  If a written response is not made within the time limits set forth in Step Two, the grievance will be considered sustained.  The time limits specified in this Article may be extended by mutual written agreement between the Employer and the Union.  For purposes of grievances and arbitrations, "days" shall be exclusive of Saturdays, Sundays and holidays.

IV.   **THE ARBITRATION HEARING, THE WITNESSES AND THE BARGAINING UNIT**:

The arbitration hearing in this matter was held on February 2, 2018, April 24, 2018, August 2 – 3, 2018, and August 24, 2018, before Arbitrator Guy Prihar.  The following people testified at the arbitration: Carolina Simmons ("Simmons"), Dues Representative for UNITE HERE, Local 11; Robin Brown ("Brown"), Organizing Director for UNITE HERE, Local 11; Alex Martinez ("Martinez"), Dues Lead for UNITE HERE, Local 11; Arelia Valdivia ("Valdivia"), Lead Organizer for UNITE HERE, Local 11;

12

Exhibit 3
3-65

1   Hugo Soto ("Soto"), Lead Organizer for UNITE HERE, Local 11; Angelina Preston ("Preston"), Regional
2   Assistant Human Resources Director for HMS Host; Elvia Cristina Martinez Hernandez ("Hernandez"),
3   Fast Food Attendant; Martin Lopez ("Lopez"), Administrative Lead; Brian Donohoe ("Donohoe"), Sr.
4   Director of Labor Relations; John Sutherland ("Sutherland"), HMS Host Sr. Staff Accountant; and Kegan
5   Reiswig ("Reiswig"), Statistician for Jackson Lewis P.C.

6        As Angelina Preston, Regional Assistant Human Resources Director for HMS Host ("Preston")
7   testified, there are approximately twelve hundred (1200) employees in the bargaining unit that work out
8   of Los Angeles International Airport ("LAX") covered by the Collective Bargaining Agreement.  [Vol. 2:
9   138:10-13]   The bargaining unit consists of all employees working at the concessions in LAX leased
10  and/or owned by HMS.

11  **V.    STIPULATED FACTS  (JX 6):**

12       On the fourth day of the arbitration proceedings in this matter, the parties stipulated to the
13  following facts:

14  1.   During the course of the current Collective Bargaining Agreement, the Union organizers did not
15       attend the Company's orientation sessions.

16  2.   During the course of the current Collective Bargaining Agreement, the Company forwarded signed
17       authorization forms to the Union periodically.

18  3.   The Company does not have a legal obligation (either under the law or the Collective Bargaining
19       Agreement) to force a new hire to execute the Union authorization form.

20  4.   The Company may not deduct dues without a signed authorization form from an employee.

21  5.   Those employees for which there were no union dues deductions as a result of insufficient funds
22       are not in dispute in this matter.

23  6.   These stipulations may not be used in any other proceeding.

24  7.   The Company will call as a witness Angelina Preston on the topic of new-hire orientations.

25  8.   The Company will review the .prn files produced by the Union.  If the Company desires to
26       introduce any of the .prn files into the record or any commentary on those files, the Company will

27

28
                                            13
────────────────────────────────────────────────────────
POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-66**

1    notify the Union and the parties will attempt to reach an appropriate stipulation on the subject. If

2    the parties cannot agree, they will seek the Arbitrator's assistance.

3    **VI.    THE FACTS:**

4        **1.    The Onboarding Process for New Hires of HMS Host.**

5            **a.   The Hiring Process.**

6        The hiring process for HMS employees working out of LAX is managed by the Company's HR

7    Leads and HR Manager[2] working out of its Los Angeles Office. [Vol. 5: Tr. 6:6-10, 6:14-21] However,

8    in anticipation of the Company's peak season over the summer, Preston will often assist the Company's

9    recruiter and human resources department in order to develop a plan for the upcoming mass seasonal

10   recruitment. [*Id*. at 7:5-22] Within the same vein, Preston provides support when it is necessary to reduce

11   staff in late July or early August, at the conclusion of the busy season. [*Id*. at 7:23-8:5]

12       The hiring process is initiated when a prospective employee visits the Company's Los Angeles

13   Office to participate in an interview with a manager. Assuming the interview is successful, an offer is

14   extended and the candidate is required to fill out a number of HR related forms. [*Id*. at 8:8-19, 10:1-3l;

15   CX 4] This information is then entered into the Company's human resources platform, *i.e.*, PeopleSoft,

16   to ensure that the new hire is in the system prior to the beginning of orientation. [*Id*. at 9:20-25]

17           **b.   The Security Clearance Process at LAX.**

18       LAX, like all other airports, mandates that any employees who require access to post-security areas

19   be vetted and obtain a security badge in order to work. [Vol. 3: 49:4-12] A prospective employee's offer

20   of employment from the Company is contingent upon successful completion of this process. [*Id*. at 50:8-

21   23] In light of significant delays, Preston has observed the entire badging process from start to finish

22   taking anywhere from ten to fourteen weeks, assuming the prospective employee does not run into any

23   security clearance issues while their application is being processed. [*Id*. at 13:11-19] Fortunately, while

24   the candidate is going through the security clearance process he or she is permitted to simultaneously

25   begin the Company's three-day orientation. [*Id*. at 14:10-15]

26   _____

27   [2] Preston briefly filled in as HR Manager for about a month between Ava White's departure and Faith BaaAdamako's hiring in October 2016, and also between BaaAdamako's departure and Nataile Ramirez's arrival from September 2017 to November 2017. Preston is currently filling in a HR Manager following Ramirez's departure in December 2017. [Vol. 5:

28   60:11-61:4, 61:15-23]

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3
3-67**

### c. New Hire Orientation.

#### i. *The Union's Testimony.*

The Union called four separate witnesses to testify about the Company's process for orienting new employees, including the process associated with informing new employees about Union membership and the payment of dues: Simmons, Brown, Valdivia and Soto.  Despite each witness being employed by the Union, having the right to attend orientation under the CBA, and having Union responsibilities associated with the members working at LAX during the relevant period covered by the grievance, none of the Union employee witnesses testified that they had **ever** physically attended orientation. [Vol. 1: 138:9-14, 181:12-15; Vol. 2, 95:20-22, 119:23-120:5][3]

Nonetheless, despite having never attended orientation herself, Brown vaguely testified as follows:

> On and off, shop stewards have attended new hire orientations.  The Union, per se, Union staff, has probably, upon occasion, attended Union orientations, but we don't **regularly** send staff to Union orientations or **whatever they are called.**

[Vol. 2: 168:8-22]  However, the Union did not present any testimony from a shop steward who attended new hire orientations and *every* organizer who testified plainly indicated that they had *never* attended an orientation.  Indeed, on the contrary, the organizers (Sotto and Valdivia) testified that it was **not** the Union's practice to attend orientation, that they had never instructed any other union staff working with them to attend, and that they had never heard of other staff attending orientation meetings during their tenures.  [Vol. 2: 96:5-8, 112:12-19; Vol. 3: 119:23-120:5, 122:6-11]

The organizers' testimony is not surprising given the fact that Valdivia admitted she doesn't even know where the orientation meetings are held (despite testifying in the very room in which orientation generally takes place),[4] before 2016 she was not even aware that the dues authorization form was included in the new hire packet, and the Union has no "process" for introducing itself to new employees because it is "too much work"  [*Id.* at 102:13-103:13, 107:20-108:2, 103:14-21, 109:22-25]  Even Brown admitted that these issues were never discussed by the Union internally.  [Vol. 1: 182:1-9]

---

[3] This ultimately culminated in the Union stipulating that no *organizer* has ever attended new hire orientation during the period that the current collective bargaining agreement has been in effect.  *See* Section V., *supra.*  However, the testimony offered at the hearing (or lack thereof) actually extends beyond organizers failing to attend the new hire orientations during the relevant period.

[4] [*See* Vol. 5: 18:18-19] (explaining that orientation takes place in the room in which the arbitration proceedings were held on the second and fifth days of the proceedings).

15

**Exhibit 3**
**3-68**

1    Despite all of the Union's testimony referenced above, Simmons, Rodriguez and Soto each

2    testified as to their apparent "knowledge" of the Company's practice at new hire orientations, including

3    the distribution and collection of dues authorization forms.  [*Id.* at 138:3-8, 167:22-168:2, 108:14-109:7;

4    Vol. 2: 118:23-119:7]

5    The Union only called one employee witness, Hernandez, who testified about participating in the

6    new hire orientation process.  However, she could not even recall what paperwork she filled out when

7    she attended.  [Vol. 2:191:5-7]

8                    **ii.  *The Company's Testimony***

9    The Company, on the other hand, presented competent testimony concerning the orientation

10   process through Preston and Donohoe.  The bulk of the Company's testimony was received through

11   Preston, as her direct reports are responsible for administering the orientation process for the Company's

12   LAX employees and she personally attended orientation sessions in the past.  [Vol. 5: 6:20-24, 48:20-

13   49:7][5]

14   Generally speaking, approximately 10-35 prospective employees attend new hire orientation, and

15   sessions are held once every three to four weeks.  [*Id.* at 21:10-12]  However, during peak season when

16   the Company is ramping up hiring for the summer, orientations are held <u>every other week</u>.  [*Id.* at 21:13-

17   24]

18   The orientation process generally takes place over the course of three days.  The first day of

19   orientation, however, is the most significant step for purposes of this arbitration as it relates to Union

20   membership and dues.

21   Indeed, on the first day the employee receives a packet of information that contains a three-page

22   carbon copy Union dues authorization form.  After the forms are distributed it is the Company's practice

23   to *briefly* describe the nature of the form, *i.e.*, as part of working for HMS each employee is required to

24

25   [5] The new hire orientations are currently conducted by the Company's HR Specialist/Recruiter, Letroy Coleman ("Coleman").  Coleman has been performing these duties from approximately February 2018 through the present.  Prior to Coleman, these duties were the responsibility of Esmeralda Morales ("Morales") during the last quarter of 2017.  Prior to Morales, these duties were performed by Sheila Mosley ("Mosley") for approximately nine months to a year.  Prior to Mosley these duties were the responsibility of Cindy Yasuda ("Yasuda") for approximately four to five months.  [*Id.* at 20:24-21:6] When there were vacancies in the human resources department the Los Angeles office received assistance from the Company's human resources department in Phoenix, as well as from Preston directly.  [*Id.* at 20:24-21:6]

26

27

28
                                                                    16

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-69**

1  join the Union and, as part of that obligation, they must determine the manner in which they intend to pay

2  their dues.  The employees have two options – each of which require their signature on the form: (1) to

3  permit the Company to deduct dues directly from their paycheck; or (2) to pay the Union directly.  [UX

4  1; Vol. 1: 142:22-143:3; Vol. 5: 24:17-25:3][6]

5        Once these options are explained to prospective employees, the Company leaves it to them to make

6  their decision and *does not push them* to choose a particular method of payment or otherwise sign the

7  document.  [*Id*.]  In fact, absent a <u>signed</u> authorization form, the Company is prohibited from deducting

8  dues.  [*Id*. at 41:4-23; Vol. 3: 38:6-14]

9        If the prospective employee refuses to sign the form at all, then no further action is taken by the

10 Company.  [*Id*; Vol. 5: 64:8-13]  Both Preston and Donohoe explained that there have been instances in

11 the past in which prospective employees have refused to select either payment option and sign the form.

12 [Vol. 2: 146:23-147:7; Vol. 3: 38:15-17]    Some of the Union's witnesses even acknowledged this fact.

13 [Vol. 1: 82:3-12; Vol. 2: 146:23-147:7, 147:23-148:1]

14        Assuming the prospective employee signs the form, the Company separates the three carbon copy

15 sheets and provides one copy to the employee, processes the second copy for its own records and sends

16 the third copy to the Union.  [Vol 2: 142:22-143:3]  HMS processes its copy of the form by placing it in

17 the employee's personnel file and inputting the information into PeopleSoft, along with other pertinent

18 onboarding information (tax information, social security number, emergency contact information, etc.).

19 This process is completed either the day of or the day after orientation, depending upon the size of the

20 orientation class.  [Vol. 5: 38:21-39:5, 40:17-22, 67:7-22]  Furthermore, the information entered into the

21 system is used as a check and balance on any claims for outstanding dues or instances in which improper

22 deductions have been made.  [*Id*. at 41:4-23][7]

23        The Company sends the Union's copy of the completed form to it on a monthly basis, if not more

24 frequently due to mass recruitment in preparation for peak season.  [Vol. 2:144:14-145:9]  The Company

25

26 ───────────────
      [6] Preston observed Yasuda passing out authorization cards during her tenure as Human Resources Manager, and also
   learned of this practice by speaking with other members of the human resources department in order to better understand their
27 job duties at the start of her employment in June 2016.  [*Id*. at 43:9-17, 44:4-11, 45:4-8]
      [7] Preston could only recall one instance in which a deduction took place without the employee's authorization and it
28 was immediately remedied.  [*Id*. at 47:1-24]

                                            17
POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-70**

provides the Union with copies of these documents on its own volition, *i.e.*, the Union has never formally requested these documents from HMS nor does the CBA expressly state any guidelines for providing them. [*Id.* at 184:21-25]

### d. The Union's Receipt of Dues Authorization Forms for New Members.

The Union's receipt of signed authorization forms is the primary method it relies upon for the creation of internal records relating to new hires. [*Id.* at 22:14-20] Indeed, the signed forms are sorted by Annie Leiva and placed in folders corresponding to the appropriate employer. Thereafter, *when she has time*, she scans the applications into the Union's computer system, otherwise known as TIMMS. [Vol. 1: 132:17-23][8]

However, the Union has only *recently* started scanning signed authorization forms into TIMMS. As a result, authorization cards received prior to the implementation of the scanning process are not in TIMMS and are either in storage or located in another Union office altogether. [Vol. 2: 24:22-25:11]

Furthermore, the Union was unable to provide any evidence relating to its protocol concerning employees who do not have signed authorization forms. Simmons testified that she "would be guessing" whether Leiva had any such system in place, and she was unsure if Leiva could generate a list of those specific employees. [Vol. 1: 132:24-134:12]

### e. The Union's Alternative Methods for Determining New Hires.

There are three alternative methods that the Union allegedly utilizes for creating records for new hires: (1) receipt of employee rosters from the Company; (2) generating missing payment reports (described in further detail in Section V.2.b., *infra*); and (3) employees coming directly to the Union's office to enroll. [*Id.* at 123:21-124:6; Vol. 2: 22:24-23:13]

According to Simmons, the Union receives employee rosters from the Company on a quarterly basis and she uploads them into TIMMS. [Vol. 1: 44:14-17, 124:19-125:12] However, Martinez (who supervised Simmons' work with HMS) indicated that the Union requests employee rosters <u>only once or twice per year.</u> [*Id.* at 19:13-23, 22:24-23:5; 77:13-17][9]

---

[8] The TIMMS software was created in the 90s and is so outdated that it cannot even read excel files. [Vol. 2: 60:22-61:12, 64:6-10]

[9] As discussed in greater detail in Section V.2.c., *infra*, this is one of many instances in which Simmons was directly contradicted by her supervisor.

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-71**

1    **2.**    <u>**The Dues Deduction Process for Employees of HMS Host.**</u>

2        **a.**  **The Union's Receipt of Dues Deductions via Wire Transfer and the**

3        **Company's Corresponding Dues Reports.**

4        The Company withholds dues for Union members working at LAX on the first paycheck of each

5  month. [Vol. 3: 96:14-16]  In order to ensure the proper amount is wired to the Union's ACH account,

6  Sutherland runs a report in PeopleSoft which lists the specific amounts being withheld from each

7  employee's paycheck for the pay period in question ("Dues Report").  [*Id.* at 96:10-12, 96:14-97:11]  The

8  Dues Reports are generated using information that has already been uploaded into the system by the human

9  resources department at the Company's Los Angeles office, as the paychecks for those employees have

10  already been generated.   [*Id.* at 133:25-134:8, 134:24-135:7]

11        Once the Dues Reports have been generated, Sutherland uses his computer to add up the total

12  amount being deducted from all Union employees for that specific pay period and inserts that amount into

13  a separate payment request form that is ultimately submitted to the Company's accounts payable

14  department.  Thereafter, that specific amount is wired to the Union the same day the request is submitted.

15  [*Id.* at 96:14-97:11]  Sutherland estimated that approximately \$35,000 - \$38,000 is wired to the Union

16  each month for LAX employees.  [*Id.* at 98:3-20]

17        Once the wire transfer is made, Sutherland emails a copy of the LAX Dues Report to the

18  representatives of both the Union (Simmons, Martinez and Rosario Espinoza) and the Company (Preston,

19  Cole and Maria Kabeitz) so that the report is received the same day as the funds.  [Vol. 3: 97:12-17, 100:5-

20  15, 100:21-101:4]

21        The Dues Report only details employees who have *authorized* the Company to deduct dues and

22  initiation fees from their paychecks.  [*Id.* at 133:15-17]  The pertinent information contained in the report

23  are each employee's social security number, the amount of the initiation fee that has been deducted (if

24  any), the amount of dues that have been deducted (if any), and a column relating to whether the employee

25  had "insufficient funds" to be deducted for the pay period in question.  [EX 2][10]

26 
27       [10] The "insufficient funds" designation generally applies to tipped employees who are required to pay taxes on credit card tips.  For example, if a bartender earns \$1,500 in two weeks in credit card tips but their minimum wage is low, taxes will eat up their paycheck and there will be nothing left to deduct for Union dues without causing the employee to dip below

28  minimum wage, hence the term "insufficient funds." [Vol. 3: 101:14-102:4]  Witnesses from both the Company and the Union

19

**Exhibit 3**
**3-72**

1    Upon receipt of the Dues Report for LAX, Leiva compares the total sum indicated in the report

2    with the total amount received by the Union's accounting office via wire transfer to ensure that the

3    amounts match up. [Vol. 2: 8:23-9:1, 9:2-15, 52:11-14]

4    If, however, an employee has *not* authorized the Company to deduct his or her dues from each

5    paycheck, payments are made directly to the Union via cash or check. [*Id.* 8:15-22] Martinez testified

6    that *most of the time* these employees tell the Union which employer they are working for and where they

7    are working. Upon receipt of these funds, Leiva allegedly creates a record of the payment in the TIMMS

8    system. [*Id.* at 10:2-16]

9            **b.  The Union's Generation of Missing Payment Reports.**

10   The      Union      occasionally      utilizes      the      Company's      Dues      Report      to      generate

11   a report of members who have allegedly authorized the Company to deduct dues, but have not had their

12   dues deducted for the pay period in question ("Missing Payment Reports").  (EX 1)

13   Simmons is responsible for generating Missing Payment Reports for the Company, <u>along with</u>

14   <u>twenty-two other employers</u> that the Union has collective bargaining relationships with. (Vol. 1: 110:24-

15   111:2, 111:18-21)  However, as noted by her supervisor, <u>it is not mandatory that she prepare Missing</u>

16   <u>Payment Reports and send them to the Company each month.</u>  [Vol. 2: 77:6-19, 69:19-70:2]  This likely

17   explains why the Company's subpoena for all Missing Payment Reports for the period in question yielded

18   only five reports. [EX 1A-1E; Vol. 2: 8:7-11] Despite the lack of reports produced, Simmons still testified

19   that she sends a report every month.  [Vol. 1: 39:2-4]

20   According to Simmons' testimony, she uploads the Company's Dues Report into the TIMMS

21   system, and thereafter the system "spits out a lot of reports…some are helpful, some are not," including

22   the list of members with outstanding dues deductions.  [Vol. 1: 34:8-35:3, 127:24-128:25][11]

23   _____

24   confirmed that the "insufficient funds" issue is routine and occurs on a widespread basis due to the ample amount of tipped
     employees working at LAX. [Vol. 1: 140:18-141:3l; Vol. 3: 42:21-24]  Donohoe further explained that the Company has never

25   involved itself in those situations and those employees deal with the Union directly to reach a resolution.  [Vol. 3: 42:25-43:4]
     [11] The reports that Simmons described as not "helpful" are a mystery to the Company because it was not given an
     opportunity to cross-examine Simmons on that contention, or the other contradictory details of her testimony relating to the

26   generation Missing Payment Reports, because the Company only became aware of these inconsistent facts on Day 2 of the
     proceedings when Martinez was called by the Union to testify and the Company was not given an opportunity to re-call

27   Simmons in its case in chief because the Union refused to produce her.  [Vol. 3: 6:16-7:2; 8:21-9:1]  This testimony
     detrimentally affects the Union's ability to argue that its claims are timely and its interpretation of Article 2.12 should be

28   accepted.  *See* Sections VII.3 and VII.4.iii.1., *infra.*

                                          20
     POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
     ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-73**

1  However, Simmons omitted the fact that she *manipulates* the Company's Dues Report *before* she

2  uploads it into the TIMMS system. The Company only learned of this omission on second day of the

3  arbitration proceedings when Martinez explained that Simmons <u>deletes all entries on the Company's Dues</u>

4  <u>Report relating to employee's who have "insufficient funds" for a deduction.</u> [Vol. 2: 21:20-23, 83:10-

5  13] <u>This creates a major redundancy in the Union's process because the Missing Payment Report contains</u>

6  <u>multiple entries for employees</u> *who could not have had dues deducted for the pay period in question.*

7  In addition to the above, Simmons omitted the fact that, after removing information from the Dues

8  Report, *she converts it into a different file format because the TIMMS system is too old to read excel files.*

9  [*Id.* at 12:7-24, 60:22-61, 62:6-10, 63:3-6] Martinez inconsistently identified the new file format as *both*

10  "CSV" and "CSB" during his testimony because when the Company subpoenaed these files for the

11  relevant time period covered by the grievance, <u>the Union claimed the files did not exist and that the correct</u>

12  <u>file format was actually known as "PRN."</u> [Vol. 3: 19:20-21, 22:9-14] When the Company sought to call

13  Martinez as a witness in support of its case-in-chief to further explore this issue, the Union took the

14  position that it could not produce him because he was no longer working for the Union. [Vol 3: 23:25-

15  24:1]

16  Instead, the Company was forced to call Lopez and learned that, despite being present for

17  Martinez's testimony as the Union's representative and knowing it was incorrect, he suspiciously made

18  no effort to correct Martinez's testimony or even discuss its substance with him directly. [*Id.* at 80:3-16,

19  80:17-21] Martinez then shifted the Union's position *again* and stated that there are "CSV" files for some

20  employers, but mysteriously not for HMS. [*Id.* at 83:6-10; 83:11-14, 83:17-21]

21  Notwithstanding the questionable process for generating the Missing Payment Reports, the actual

22  reports contain various entries that are highlighted in different colors based on the comparison between

23  the information in the Union's TIMMS system and the Company's Dues Report. [Vol 2: 20:6-15]

24  Specifically, entries highlighted in red correspond with names that are *not* in the TIMMS system, and

25  entries highlighted in pink relate to names of *"inactive"* employees. [*Id.* at 13:5-21]

26  With respect to "red" entries, Simmons is responsible for creating a new record in the TIMMS

27  system so that the Union can apply dues to that specific member. [*Id.* at 14:17-15:2] There was no

28

21

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-74**

1    testimony as to whether Simmons ultimately *removes* that entry from the Missing Payment Report.  In
2    fact, she falsely testified that such entries do not even show up on the Missing Payment Report.  [Vol. 1:
3    38:9-12]

4           "Pink" entries are slightly more complex.  For those entries the employee in question has
5    historically worked for a different employer and TIMMS flags that entry because it does not recognize he
6    or she as being grouped with HMS.  In order to correct the information in TIMMS, the Union can add
7    HMS as a "secondary employer" in order to post the dues.  [Vol. 2: 15:13-19]  There was no testimony as
8    to whether Simmons ultimately removes these entries from the Missing Payment Report either.

9           Notably, the Missing Payment Report does not indicate whether the employee in question has
10   actually signed a dues authorization form and Simmons does not check the Union's files to make that
11   determination.  [Vol. 1: 120:8-14; 120:25-121:2; 130:1-8, 131:8-11]  When Martinez was pressed as to
12   why this check and balance was not utilized by the Union, he merely stated that it was "too much work."
13   [Vol. 2: 25:11-22]   Rather, Simmons only relies upon the TIMMS system through which dues
14   authorization cards have only recently been scanned onto the platform.  [Vol. 1: 105:22-106:2; Vol. 2:
15   24:22-25:11]

16                      c.  **The Company's Response to the Union's Missing Payment Reports.**

17          After the Missing Payment Report is generated by Simmons, she sends a copy via email to the
18   Company's representative seeking a reason as to why dues were not deducted for each specific employee
19   on the list.  [Vol. 1: 37:14-19; Vol. 2: 22:3-7]

20          There are many reasons why dues may not be deducted for a specific employee, *e.g.*, the employee
21   had "insufficient funds," the employee was terminated, the employee is on a leave of absence, or the
22   Company does not have a dues authorization card on file for the specific employee.  [EX 1A, at 1 of
23   Attachment;[12] Vol. 1: 116:5-14; Vol. 2: 70:10-25]  If an employee has been terminated, there is often a
24   delay in the manager notifying human resources because employees often stop showing up for work
25   without warning.  [*Id.* at 180-19-181:2]  The same lapse in time can also occur with employees on a leave

26

27   _____
        [12]  There are two versions of the attachment to EX 1A, the second version contains responsive entries from the
28   Company.

_____
POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-75**

1     of absence because there is often a delay in them providing the Company with the appropriate paperwork.

2     [*Id.* at 181:17-24]

3          Preston has previously reviewed Missing Payment Reports when covering those responsibilities

4     due to vacancies in the human resources department. [Vol. 3: 53:3-17; *see also* FN 2 and 5, *supra*] Preston

5     conceded at the hearing that the Company does not always timely respond to the Union's Missing Payment

6     Reports because they are often inaccurate. [Vol. 3: 55:4-18] This likely results from the redundancies

7     associated with members who have "insufficient funds," as well as the other flaws in the Union's

8     processes, discussed in Section VI.2.b., *supra.*

9              d. **The Union's Dues Policy and its Lax Enforcement of the Union Security**

10                 **Clause.**

11          According to Simmons' testimony, Union members are no longer considered in "good standing"

12     if they have outstanding dues for three consecutive months. [Vol. 1:113:6-20] This same principle applies

13     to members who have "insufficient funds" to pay their dues, *i.e.*, it remains the member's responsibility

14     to cover their dues for those months regardless of their earnings. [Vol. 2: 18:24-19:2]

15          When members have outstanding dues, the Union sends them a letter indicating the outstanding

16     amounts and leaves it up to them to satisfy the debt owed. [*Id.* at 49:24-50:19] If the member in question

17     still fails to pay the outstanding amount owed the Union sends a second and, if necessary, a third letter,

18     seeking to collect the outstanding amount. If the outstanding dues are still not paid, the Union allegedly

19     considers enforcing the Union Security clause. [*Id.* at 51:2-8]

20          According to Martinez, the decision to enforce the Union Security clause is ultimately made by

21     Ada Briceno, Union President. [*Id.* at 73:21-75:2] However, out of all the Union's witnesses who

22     testified, only Simmons and Martinez could recall <u>three</u> instances in which the Union sent the letters

23     referenced above to trigger the union security clause for <u>other employers</u>, and neither of them could recall

24     an instance in which the Union moved to enforce the Union Security clause for HMS. [Vol. 1:152:2-14;

25     Vol. 2: 75:11-18, 76:13-77:2]

26

27

28

**Exhibit 3**
**3-76**

### 3. The Parties Negotiation of the Current Collective Bargaining Agreement.

As the expiration of the parties' prior collective bargaining agreement was approaching, they participated in approximately six to ten negotiation sessions for a successor agreement to cover the period of 2015 – 2018. [*Id.* at 34:14-17]

Donohoe attended each session as the Company's chief negotiator. [*Id.* at 32:25-33:4]  The lead negotiator for the Union was Tom Walsh, however, the Union also assembled a negotiating committee to assist him consisting of Rodriguez, Valdivia and other Union staff. [*Id.* 33:25-34:13]

Donohoe testified that at *no point* during any of the negotiation sessions did the Union raise the subject of dues, dues checkoff, or union security. [*Id.* at 33:10-18] The Union, on the other hand, offered absolutely no testimony about negotiations.

### 4. HMS Host Acquires CMS' Contracts for LAX Concessions in August 2016

On August 20, 2016, HMS acquired various leases of a competitor concessionaire known as CMS and immediately assumed those operations on the day of the transaction. [Vol. 2: 133:22-25; Vol. 3: 46:2-7; Vol. 5: 26:5-11]

HMS extended conditional offers of employment to approximately three hundred former CMS employees. [Vol. 2: 166:3-5; Vol. 3: 46:8-11]  The offers were conditional upon each employee attending the Company's new hire orientation and obtaining a new security badge.

Instead of spreading the new hire orientation sessions over the course of three days, the Company expedited the process and combined all of the sessions into one full day. [Vol. 5: 31:13-19]  Due to the sheer size of the incoming employees, an orientation session was held *each day* for a full week in June 2016. [*Id.* at 26:19-25, 27:1-8]  As part of its standard orientation procedure, HMS provided each new employee with a dues authorization form.  Indeed, even if the employees had previously permitted CMS to deduct their dues, HMS *could not legally* deduct dues from these employees without an updated form authorizing it to do the same. [Vol. 2: 162:23-163:8]

### 5. Dues Arrears Resolved by the Parties in October 2016.

In or about October 2016, Sutherland recalled generating a Dues Report relating to a wire transfer that was significantly larger than the average monthly payment made by the Company. [Vol. 3: 102:24-

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-77**

103:4]  Indeed, rather than the typical transfer of approximately 30k, the transfer for this month was two times larger.  [EX 2]

Sutherland further testified that the reason for the larger wire transfer was likely related to an agreement between the Company and the Union to make additional withholding for specific members who owed approximately two months-worth of outstanding dues.  (Vol. 3: 103:11-22]

Sutherland's testimony is further corroborated by email correspondence between Preston and Simmons in October 2016.  [UX 14, UX 15]  Indeed, on October 13, 2016, Simmons inquired as to the status of outstanding dues for September and October 2016 owed by former CMS employees that were hired by the Company and stated "the Union…expect[s] the [C]ompany to deduct double the dues for all the [members] that owe."  [UX 14 at 1]  After some further back and forth, the Company agreed to deduct the arrears in question and requested a list of the relevant employees from the Union.  [Id. at 5][13]  The Union provided the requested list to the Company on October 18, 2016.  [Id. at 9]  The Company reviewed the list and agreed to expedite payment by the end of the month, however, it also noted that there were approximately forty-four employees on the Union's list that were either terminated, never transitioned to HMS or were not members of the bargaining unit, and as such, dues would not be deducted for them.  [UX 15]  The Union did not object.

**6.    The Union Files a Grievance on Behalf of All Affected Employees Who Have Allegedly Not Had Dues Deducted.**

**a.    The Union Learns of the Allegedly Outstanding Dues Deductions in Late 2016.**

On November 15, 2016, Simmons contacted Jeff Pantel ("Pantel")[14] to verify why an employee, ▮▮▮▮, was not paying his dues and questioned whether this qA part of a more widespread issue.  [UX 5][15]  Pantel explained that he had recently returned to his assigned office in Phoenix, but agreed to

---

[13] The Union did not paginate this exhibit.  Please keep in mind that this exhibit is double sided when searching for the relevant pages cited in this brief.

[14] As explained in FN 2 and 5, *supra*, there were periods of time where the Company's Phoenix branch assisted the Los Angeles branch with its human resources responsibilities.  This explains why Simmons reached out to Pantel on this particular issue.

[15] The Union sought to admit various statements from employees regarding their contention that they had signed an authorization form but their dues were not being deducted.  The arbitrator received these documents, but not for purposes of establishing that the employees in question actually filled out and signed an authorization form.  [Vol. 1: 83:19-22, 86:20-87:19, 95:12-86:9, 97:12-17]

25

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-78**

1   speak with Yasuda about it. [*Id.* at 1]  Yasuda responded to Simmons three days later and explained that

2   she would contact corporate payroll. [*Id.* at 5][16]

3         On December 9, 2016, Preston emailed Simmons and explained that she would meet with Yasuda

4   and have her report back after she had pulled the relevant employee roster and performed the necessary

5   research. [*Id.* at 7]  Indeed, later that same day Yasuda responded to Preston's email and indicated that

6   she was in the process of auditing the Company's records. [*Id.* at 8]

7         On December 15, 2016, Simmons asked for a status update. [*Id.* at 10]  In response, Yasuda left

8   Simmons a detailed voicemail on December 22, 2018, since she was on vacation. [*Id.* at 12]  Simmons

9   could not recall the substance of Yasuda's voicemail. [Vol. 1: 53:1-10]

10        On January 30, 2017, Simmons emailed BaaAdomako and Preston to request a teleconference

11  regarding the status of the outstanding dues issue. [UX 6 at 1]  The parties agreed to speak that Friday,

12  and in advance of the call BaaAdomako agreed to provide a breakdown of employees who were on leave

13  of absence or "inactive" due to termination.  BaaAdomako also requested a list from Simmons relating to

14  the Union's records of signed authorization cards. [*Id.* at 3-4]

15        When the parties ultimately spoke via telephone that Friday, *i.e.*, January 6, 2017, Preston agreed

16  to provide Simmons with an updated employee roster. [Vol. 1: 58:11-24]  However, Preston also indicated

17  to Simmons that some employees refused to sign the authorization form altogether during orientation.

18  [Vol. 1:82:3-12]

19        On February 6, 2017, the Union followed up with the Company regarding its request for an updated

20  employee roster from the Company. [UX 4]  The roster was ultimately provided to the Union and, on

21  February 23, 2017, following her meeting with Preston and BaaAdaako, Simmons provided them with the

22  Union's audit of the employee roster sent earlier that month. [Vol. 1: 62:1-3; UX 7A-B]  Simmons'

23  analysis of the roster was *partially* based off of the information contained in the TIMMS system; she was

24  unable to recall the foundation for the remainder of her analysis. [Vol. 1: 65:5-15]

---

[16]  Yasuda replaced Ava White at the Company.  *See* FN 5, *supra*.

26

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-79**

**b. The Union Files the Instant Grievance and Rejects the Company's Proposals to Resolve It.**

Despite the fact that the Company and the Union were making efforts to resolve the issue relating to allegedly outstanding deductions, Lopez filed a grievance <u>on behalf of all affected employees</u> on March 15, 2017. [JX 2] Lopez testified that his reason for filing the grievance was that the Company did not collect authorization cards and did not make dues deductions. [Vol. 2: 205:25-206:4]

On April 10, 2017, the parties participated in a Step 2 grievance meeting. Simmons and Lopez participated on behalf of the Union and Eric Walden and Baadamako represented the Company. Lopez claimed he did most of the talking and the Union tried to resolve the issues that were the subject of the grievance. [Vol. 2: 207:17-208:8] In response, Faith asked what efforts the Union had taken to collect *directly* from the members and informed Lopez that there were several members who refused to complete the authorization forms. Lopez asked for their names so that the Union could "take action." [*Id.* at 208:13-23] In closing, Faith requested an updated list from Simmons so that she could continue researching the Union's allegations. [*Id.* at 209:16-22]

On April 26, 2017, the Union filed a demand for arbitration. [JX 3] In a further effort to resolve the matter and avoid adversarial proceedings, the Company participated in a conference call with the Union in or about late May 2017; Donohoe participated on the Company's behalf and both Brown and Lopez represented the Union. [Vol. 3: 38:18-39:5] Donohoe explained that the Company typically works collaboratively with any union when these types of disputes arise and makes a mutual arrangement for the deduction of dues arrears. However, Brown argued that the Company was <u>directly</u> responsible for the allegedly outstanding amount. [*Id.* at 40:3-11, 41:2-9][17]

In response, Donohoe reviewed the contract language with Brown and pointed out that the last sentence in Article 2.12 specifically states that it <u>does not relieve the employees' of their obligation to remain members in good standing.</u> [JX 1 at 3] Donohoe again proposed to work with the Union in obtaining outstanding dues from the employees, and explained that Brown's proposal was outside the scope of how the Company has collaborated with UNITE HERE! in the past, as well as Local 11 specifically. [*Id.* at 41:11-20] In closing, Donohoe agreed to provide the Union with an updated roster

---

[17] Around this same time period, the Company responded to the Union's missing payment report. The vast majority of these entries related to employees who were either terminated or on leave of absence. [EX 1A at 1-7 of attachment].

27

**Exhibit 3**
**3-80**

1  indicating the status (active, terminated or leave of absence) of all employees and this information was

2  ultimately provided to the Union in June 2017. [*Id.* at 44:6-14]

3      In a subsequent effort to resolve the grievance, the parties participated in another conference call

4  on May 31, 2017. The primary purpose of the call was to discuss the transition of former CMS employees

5  to Host, as some of those employees were owed back pay for wage increases that were set to go into effect

6  in October pursuant to the Union's collective bargaining agreement with CMS. [UX 18 at ¶ 3] As such,

7  Donohoe proposed that this would be a good opportunity for the Union to recover some of the dues arrears

8  in question. [Vol. 3: 44:21-46:1]

9      However, Brown again insisted that the Company was liable and refused to agree to deduct any

10  dues arrears related to former CMS employees. [*Id.* at 47:1-6] Donohoe maintained his initial position

11  and added that if the employees are *currently working and have signed authorizations*, the parties should

12  be taking steps to recover those amounts – but again, Brown refused. [*Id.* 47:7-15, 47:16-22] Notably,

13  she also failed to make the distinction that some of the issues related to former CMS employees *may have*

14  *arisen prior to HMS' acquisition of the CMS leases.* [*Id.* at 47:23:-48:1] In closing, Donohoe agreed to

15  have the Company review the Union's spreadsheets regarding employees they needed more information

16  about and to pull any additional information that was responsive to the Union's needs. [*Id.* at 66:23-67:5,

17  69:6-12, 71:8-13][18]

18      Following the conference call, Lopez provided Donohoe with an updated list compiled by

19  Simmons that allegedly represented the Union members with outstanding dues, which Donohoe agreed to

20  have his team audit earlier that day. [UX 8A-C] Some of the entries on the spreadsheets related to

21  outstanding balances owed by former CMS employees that arose during their tenures at CMS. [Vol. 1:

22  78:12-17, 79:11-16]

23

24

25

26  _____

27  [18] Brown testified that Donohoe blamed Faith's job performance for the grievance at issue during this phone call.
[Vol. 1: 175:5-11] Donohoe denied these claims and explained that there was never any conversation about Faith's job
performance. He further explained that she had been working at the Company for less than a year at that point and was doing

28  a good job given the fact that she had been working at a busy branch with considerable employee turnover. [Vol. 3: 69:6-12]

28

**Exhibit 3**
**3-81**

7.    **The Parties Participate in Mediation and Enter into an Agreement to Share Information.**

In or around October 2017 the parties voluntarily participated in mediation in an attempt to resolve the grievance.   To that end, the parties agreed to a process for exchanging information in order to have a more accurate picture of the amount of outstanding dues, if any.   [JX5]   Pursuant to the agreement, the parties agreed to the following schedule for sharing information:

-    By November 1, 2017, the Company would provide the Union, in excel format, a chart containing the following information for all employees in the bargaining unit at any time between February 1, 2016 to the present: (a) the name of the employee; (b) hire date; (c) termination date (if applicable); (d) social security number; and (e) current job classification (the "Chart").  [*Id.* at 1]

-    By November 15, 2017, the Union would add the following information to the Chart and return it to the Employer: (a) the amount of dues that the employee owes for each month; (b) whether the Union has a dues checkoff cared for the employee and, if so, the date the card was signed. [*Id.* at 2; UX 11 and 20][19]

-    By December 6, 2017, the Company would add the following information to the Chart for any employee and return it the Union: (a) whether the Employer has a dues checkoff card for the employee and, if so, the date the card was signed; (b) a copy of the dues checkoff cards; and (c) whether the employee has changed classifications between February 2016 and the present and, if so, dates the employee worked in each classification.  [*Id.* at 3]

In closing, the parties agreed that by participating in the mediation neither of them were waiving any position it might take in arbitration.  [*Id.* at 4]  The parties were unable to come to a resolution through mediation process.

8.    **The Company's Analysis of the Union's Grievance.**

In light of the Union's demand for approximately $300,000 worth of allegedly outstanding membership dues, the Company utilized a statistician, Reiswig, to analyze the merits of this assertion (assuming *arguendo* the Company was in fact liable for *some* outstanding deductions).  [Vol. 3: 138:4-7]

---

[19]  This information was added by the Union's temporary employee using the information contained in the TIMMS system.  [Vol. 2:226:17-227:8]

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-82**

1   Reiswig was tasked with reconciling the Union's spreadsheets for both active and terminated employees,

2   *i.e.*, UX 11 and 20, with the Company's Dues Reports from February 2016 – October 2017. [*Id.* at 143:2-

3   14] Reiswig's analysis uncovered three separate issues that disproved certain portions of the Union's

4   data. [EX 3]

5       The first issue related to deductions the Union is claiming are owed *that occur outside of an*

6   *employee's tenure* ("Issue One"). Issue One occurred on 430 different occasions, across 345 different

7   employees, totaling $25,800. [*Id.* at 145:20-23, 146:4-10]

8       The second issue corresponded with deductions that are in fact listed in the Dues Reports as being

9   deducted, but nonetheless show up on the Union's data as unpaid dues – usually because they concern

10  members with "insufficient funds" for deductions during the requisite period ("Issue Two"). [*Id.* at

11  146:24-147:7] Issue Two occurred on 1,425 different occasions, across 480 different employees, totaling

12  $63,087.04. [*Id.* at 147:8-22]

13      The third issue constituted instances in which the Union was claiming outstanding dues for

14  employees *who did not execute a dues authorization card* ("Third Issue"). Reiswig was able to make this

15  assessment because the Union's spreadsheets contain a column indicating whether an employee has signed

16  an authorization card. [*Id.* at 148:4-150:8] Issue Three occurred on 2,880 different occasions, across 633

17  different employees, totaling approximately $170,000. [*Id.* at 150:9-15][20]

18      Last, Reiswig also performed an analysis of the timeliness of each occurrence contained in the

19  Union's spreadsheets based on the date the grievance was filed. The assumption Reiswig was operating

20  under was that the grievance only had a fifteen day retroactive period from the date it was filed, *i.e.*, March

21  15, 2017. Applying this assumption to the Union's data, approximately $168,000 worth of claims for

22  unpaid dues were "untimely" because they took place between February 2016 and January 2017, *i.e.*,

23  outside the fifteen day period. [*Id.* at 151:1-152:21] This analysis, however, is in addition to Issue One,

24  Issue Two and Issue Three. [*Id.* at 154:7-9, 154:20-22]

25

26      [20] In light of the fact that the issues revealed by Reiswig's analysis may have a tendency to overlap on a specific

27  occasion, e.g., an employee's allegedly outstanding deduction falls outside of her tenure and she never executed a dues

    authorization, Reiswig performed a separate analysis that would only count those instances as one occurrence. [Vol. 3: 173:7-

28  19] When Reiswig accounted for no overlap between Issue One, Issue Two and Issue Three, he found a total of $215,000

    worth of inaccurate claims for unpaid dues. [*Id.* at 175:6-9]

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-83**

## VII.   ARGUMENT:

1. **The Union's Grievance Must Be Denied Because the Agreement Does Not Support the Filing of Class Action Grievances.**

The Union filed the instant grievance "on behalf of all affected employees" and specifically identified it as a "class action grievance." [JX 2]  However, the Agreement's grievance and arbitration procedure *does not expressly support the filing of such grievances and there has been no evidence presented by the Union of any binding past practice to indicate otherwise.*  Since both the Agreement and the parties' prior dealings do not support the filing of a class action grievance, the Union's claim must be denied outright and it must file claims on behalf of each individually affected employee.

According to Rule 23 of the Federal Rules of Civil Procedure, class actions are created <u>by the jurisdiction that tries the action and not unilaterally by the statement of one of the parties.</u>  Fed. Rule of Civ. Pro. 23; *Sunkist Growers,* 121 BNA LA 513, 515 (Pool 2005).  This is not surprising given the complex nature of class action claims.  Indeed, class actions are governed by separate bodies of case law, unique procedural rules and separate complex divisions of court systems in order to deal with the nuances associated with parties seeking class-wide relief.  *See, e.g.,* California Rules of Court, Rule 3.3(k); *Duran v. U.S. Bank Nat. Ass'n* (2014) 59 Cal.4th 1, 28-30 (class certification principles); *City of San Jose v. Sup. Ct.* (1974) 12 Cal. 3d. 447, 458-64 (community interest factors).  A general grievance and arbitration procedure, such as the one contained in Article 10 of the Agreement, is obviously not suited to handle such claims.

Indeed, the language of Article 10 makes absolutely no reference to class action relief, or grievances filed on behalf of "all affected employees."  Rather, the grievance procedure is limited to claims or disputes "between the Employer and the Union or between the Employer and *any employee* which involves interpretation, application or enforcement of this Agreement..." [JX 2] (emphasis added)  This places the present case on all fours with *Sunkist Growers* where Arbitrator Pool found the Company's argument to be "persuasive" in the "absence of any language that referred to 'class action grievances'" as well as the fact that the agreement "refer[red] only to 'disputes arising out of the Agreement.'"  *Sunkist Growers*, 121 BNA LA at 515-516.

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-84**

Clear language supporting the filing of such grievances would have specified "'class action,' 'class grievance' or used the word 'group' or even 'policy,' to indicate the that parties expressly agreed to cover such claims." *Celebrity Cruises*, 126 BNA LA 639, 641 (Hoffman 2008). These terms are absent here and the record is barren of any evidence indicating that the parties have litigated class-wide grievances in the past, or that the language of Article 10 was intended to cover class action grievances when it was negotiated. In the absence of this evidence, it cannot be inferred that the parties intended Article 10 to cover the instant grievance. To rule otherwise would ignore arbitral precedent, effectively add an additional caveat to Article 10 and amount to a rewriting of the instant Agreement.

The Union may argue that requiring the instant claims to proceed on an individual basis would be both inefficient and expensive. *See, e.g., Tyson Foods, Inc.* 123 LA 484 (Bankston 2006). This argument must be rejected because it ignores the prejudice associated with forcing the Company to arbitrate claims being made by over 2,000 different employees – many of whom are no longer even employed by the Company.

For example, in order to certify a class in state court, the class representative must establish a well-defined community of interest among class members, including claims that are "typical" of the class – otherwise known as the typicality requirement. *City of San* Jose, 12 Cal. 3d at 458-64; *Fireside Bank v. Super. Ct.* (2007). In the present case, the typicality requirement is lacking because there are a handful of significant and different reasons why dues may not have been deducted for each of the affected employees in question. Since each individual case turns on its own facts, the employer is placed at a significant disadvantage when it is required to litigate all of these claims on a wholesale basis. This difficulty is exacerbated by the fact that different employees for both the Union and the Company presided over the employees working at HMS during different time periods, and many of the affected employees no longer work for the Company. Therefore, in this unique circumstance, individual claims are actually better suited to determine whether a violation of the Agreement has actually taken place.

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-85**

2.     **Article 2.12 of the CBA is Unlawful Because it Violates the Labor Management Relations Act.**

Unless a direct payment by an employer to a union falls into one of the enumerated exceptions contained in 29 U.S.C. § 186(c), the transaction subjects the offending party to criminal penalties and potential imprisonment.  29. U.S.C. § 186(d).  Article 2.12 of the Agreement blatantly violates this proscription because it seems to *expressly* force the Company to *indemnify* the Union for any dues that have not been collected or paid.  Since the language which forms basis for the Union's entire grievance is unlawful, the grievance must be denied.

Sections 2.10 and 2.12 of the Agreement expressly provide the following:

> 2.10. The Employer agrees to deduct Union initiation fees and monthly dues form employees' earnings as required…[s]aid deduction shall be made from the last payroll period of each month and shall be deposited directly into the Union's bank account not later than the 15th day of the following month…
> …
> 2.12. …If an Employer has agreed to the deduction of dues pursuant to this Article and fails to collect or pay over such dues pursuant to this Article, the Employer shall be liable for regular dues and initiation fees which the Union loses by reason of the Employee's failure.  [JX 1]

Each of these provisions merit a separate analysis under Section 186 to determine whether an applicable exception is met, as strict and literal compliance is mandated by the law.  *See, e.g., Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund v. Fairfield County Sprinkler Co.* (2nd Cir. 2001) 243 F.3d 112, 116; *Reinforcing Iron Workers v. Bechtel Power Corp.* (E.D. Mich. 1978) 463 F. Supp. 643, 645.  Section 2.10 neatly fits the dues checkoff exception contained in Section 186(c)(4).  However, Section 2.12 does not satisfy *any* of the exceptions enumerated in subdivision (c) – including (c)(4).  *See Int'l Longshoremen's Ass'n v. Seatrain Lines, Inc.*, 326 F.2d 916, 920 (2nd Cir. 1964) (the dues checkoff exception "provided the exclusive method by which employers may contribute to the general purpose funds of union and as making payments in lieu of checkoff") (emphasis added).

Rather, Section 2.12 seeks to create contractual liability for any "dues and initiation fees which the Union loses by reason of the Employee's failure."  There is no statutory exception for this and as such,

33

**Exhibit 3**
**3-86**

1  the language at issue plainly violates Section 186.  <u>This is significant because the Union relies on this</u>

2  <u>language for an award – indeed, during the grievance process Brown</u> *relied on this specific section of the*

3  *Agreement when refusing Donohoe's proposal to deduct dues arrears.*  *See* Section VI.6.b., *supra.*

4        Despite having the burden of proof in this case, the Union failed to present any evidence

5  concerning the intent of this provision.  Nonetheless, the parties intent in drafting this vague subsection

6  of the Union security clause is irrelevant because no "corrupt purpose" is necessary to establish a violation,

7  rather, the act of payment must simply be done voluntarily and not by accident or mistake.  *United States*

8  *v. Phillips* (11th Cir. 1995) 59 F. 3d 1095, *2; *United States v. Int'l Bhd. of Teamsters* (S.D.N.Y. 1997)

9  965 F. Supp. 493, 499.  Therefore, this is a no fault statute and irrespective of the parties' intentions, the

10  grievance must be denied because the language at issue is unlawful and void.  To rule otherwise would

11  subject the arbitration award to be overturned by a court with proper jurisdiction over a petition to vacate.

12  *See Jackson Purchase Rural Elec. Cooperative Ass'n. v. Local Union 816, Int'l Bhd. of Elec. Workers*

13  (6th Cir. 1981) 646 F.2d 264, 267-68.

14        While federal courts have directed employers to directly pay unions outstanding dues in the past

15  without running afoul of Section 186, <u>those cases are distinguishable from the present claim due to the</u>

16  <u>unique contract language at issue here.</u>  *See, e.g., Washington Post v. Washington-Baltimore Newspaper*

17  *Guild, Local 35* (D.C. Cir. 1986) 787 F.2d 604, 607 (declining to vacate an arbitral award requiring the

18  employer to pay back-dues directly to the union); *Humility of Mary Health Partners v. Local 377* (N.D.

19  Ohio 2003) 296 F. Supp. 2d 840, 846-47 (following federal precedent that has interpreted the settlement

20  exception to encompass arbitration awards for owed dues).

21        Indeed, in each of the cases cited above, none of the contract language being examined by the

22  courts imposed <u>express contractual liability</u> upon the employer due its failure to deduct initiation fees

23  and/or dues.  Thus, the inquiry was significantly broader than the issue here, *i.e.*, whether an arbitrator's

24  <u>remedial power</u> permits the award of money to the union.  *See Humility of Mary Health Partners*, 296 F.

25  Supp. 2d at 846 (*citing United Steelworks of America v. United States Gypsum Co.* (5th Cir. 1974) 492

26  F.2d 713, 734) The answer to that question is clear, as Section 186(c)(2) expressly provides for it.  29

27

28

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-87**

1  U.S.C. § 186(c)(2) ("the provisions of this section shall not be applicable…(2) with respect to the…award

2  of an arbitrator…")

3      However, the narrower issue, *i.e.*, whether a collective bargaining agreement can impose express

4  contractual liability upon an employer due its failure to deduct initiation fees and/or dues, seems to be one

5  of first impression.[21] Rather it is more closely analogized to a payment *in lieu of dues*. *See Seatrain Lines,*

6  *Inc.*, 326 F.2d at 920 (agreement to pay a certain percentage of revenue to a union in compensation for

7  diminished dues collection violated Section 186)  Thus, the grievance must be denied because the

8  underlying contracting language that forms the basis of the dispute is unlawful.

9      **3.    The Union's Claims for Outstanding Deductions Occurring More Than Fifteen Days**

10          **Before the Grievance Was Filed Are Untimely.**

11     Article 10.2 of the Agreement provides the "exclusive" procedure for the filing and processing of

12  grievances and mandates that they be filed "within fifteen days of the occurrence or of the time the

13  Grievant should have reasonably had knowledge of the occurrence which gave rise to the grievance." [JX

14  1]  Thus, any claims which predate the filing of the grievance by more than fifteen days are untimely and

15  must be denied outright.

16     The grievance at issue was filed on March 15, 2017.  [JX 2]  Therefore, the grievance is only

17  retroactive to dues deductions that allegedly failed to take place between March 1, 2017 and March 15,

18  2017.  Indeed, according to Simmons the Union originally brought the outstanding dues issue to the

19  Company's attention on November 15, 2016 – three months before the grievance was filed.  [UX 5]

20  Moreover, now the Union is asserting claims on behalf of "affected employees" that took place as far back

21  as February 2016.  [UX 3]  The Union should not be rewarded for its blatant disregard of the time

22  limitations imposed by Article 10.2 and any claims occurring outside of the fifteen day limitation period

23  must be denied.

24     The Union may advance two arguments in defense of its untimely claims: (1) Article 2.10 provides

25  the Union with three years to grieve dues related issues; and (2) the claims at issue amount to a continuing

26  violation of the contract.  Each of these claims must be rejected.

27

28     [21]  The Company was unable to find any authority where an arbitrator or court was examining language similar to
Section 2.12 of the Agreement.

35

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-88**

1   Article 2.10 provides that "[t]he employer is not liable for any mistakes related to this section

2   which are not brought to its attention in writing within three years." However, this language says nothing

3   about the contractual deadline for filing a *grievance* under Article 10.2. Rather, this section is vaguely

4   concerned with "mistakes." This language is ambiguous, at best, and there was absolutely no testimony

5   from the Union about its intent, let alone what it means in light of Article 10.2.

6   More importantly, however, Article 10.2 *clearly* states that it provides the "<u>exclusive</u>" procedure

7   for the filing and processing of grievances. Therefore, this article must control and the Union should not

8   be permitted to retroactively grieve events that took place <u>three years ago</u>. *See* RESTATEMENT (SECOND)

9   OF CONTRACTS § 202, cmt. D (1981) (when the principal purpose that the parties intended to be served by

10   a provision can be ascertained, the purpose is to be given great weight in interpreting the words of the

11   provision); *see also* Elkouri & Elkouri, HOW ARBITRATION WORKS, 9-33 (7th Ed. 2012).

12   Furthermore, to hold the Company hostage to the alleged three year "mistake" period is prejudicial

13   because the Union's record keeping and process for generating "Missing Payment Reports" is inherently

14   flawed and redundant. *See* Section VI.1.d-e, *supra* (the Union's defective methods for keeping track of

15   new hires); Section VI.2.b, *supra*, (Simmons and Martinez's conflicting testimony regarding the

16   generation of "Missing Payment Reports") This places a significant administrative burden on the

17   Company because, as Preston testified, the Union's reports are often inaccurate, <u>and they are not even</u>

18   <u>generated on a monthly basis</u>. [Vol. 3: 55:4-18; EX 1A-1E; Vol. 2: 8:7-11] Preston's testimony is

19   corroborated by the Company's damages analysis that revealed a myriad of incorrect claims – rendering

20   more than 50% of the Union's "damages" as inaccurate. Section VI.8., *supra* (the Company's analysis of

21   the multiple flaws associated with the Union's data; *see also* FN 20)

22   The Union should not find any refuge in a "continuing violation" theory either. This defense begs

23   the question of whether each individual claim for dues that has not been deducted constitutes a "single

24   isolated and completed transaction." *See State of Oregon Dept. of Corrections*, 127 LA 641, 647-49 (Gaba

25   2010) (finding the allegedly incorrect setting of the Officers' pay to be a single isolated and completed

26   transaction); *Sunkist* Growers, *Sunkist Growers,* 121 LA at 515 ("the concept of a 'continuing

27   violation'…is applicable in instances wherein each day that passes there is another occurrence of the same

28

36

**Exhibit 3
3-89**

1    violation"); *Bureau of Engraving*, 114 LA 598, 605 (Bard 2000) ("clock starts" each time the employer

2    refused to pay its portion of the cancellation fee).

3         The answer to this question must be "yes;" similar to *State of Oregon Dept. of Corrections* the

4    "single isolated and completed *transaction*" is the alleged failure to deduct dues and/or initiation fees for

5    a specific employee – not the paycheck they receive every two weeks.   *State of Oregon Dept. of*

6    *Corrections*, 127 LA at 648.[22] These alleged violations occurred sporadically and for a myriad of different

7    reasons, *e.g.,* failure to complete a dues authorization form, termination, leave of absence, etc.  It would

8    be prejudicial to the Company to group all of these transactions together as a continuing violation for

9    approximately 2,000 employees (many of whom no longer for the Company) and hold the Company

10    responsible for three years.  Such a finding would cause the exception to subsume the rule.

11       **4.**      **Assuming *Arguendo* the Union's Grievance is Arbitrable and Timely, it Still Fails**

12             **Because the Union Did Not Satisfy its Burden of Proof that the CBA Was Violated by**

13             **the Company.**

14         The party asserting the claim has the burden of proving it.  *Compare Exxon Mobil Ref. & Supply*

15    120 LA 1734, 1748 (Eisenmenger 2004) (Company has burden of proving just cause in termination

16    arbitration) *with West Valley City Sch. Dist.*, 120 LA 756, 761 (Gaba 2004) (Union must establish that the

17    employer violated the parties' collective bargaining agreement in a contract interpretation arbitration by a

18    preponderance of the evidence); *South Peninsula Hospital,* 120 LA 673 (Landau, 2004).  In the present

19    case the Union has failed to satisfy its burden of proving by a preponderance of the evidence that the

20    Employer has violated Articles 2.7 and 2.12 of the CBA for the reasons stated below.

21        **i.**   **The Company Cannot Be Held Responsible for Any Outstanding Dues of Former**

22            **CMS Employees That Were Incurred Prior to August 20, 2016.**

23         The Union has asserted claims for outstanding dues owed by former CMS employees that were

24    incurred *prior* to the Company's assumption of CMS' leases.  These claims must be rejected out of hand

25    because the Company did not employ the workers at that time.

26

27    
_____

   [22] In *State of Oregon Dept. of Corrections* the Arbitrator applied the ordinary and popularly accepted meaning of the

28    word "transaction."  127 LA at 648.

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-90**

As testified by the Company, even if the employees in question had previously permitted CMS to deduct their dues, HMS *cannot legally deduct dues from the employees without an updated form authorizing it to do the same.* [Vol 2: 162:23-163:8]  Indeed, the Union turned a blind eye to these occurrences during the parties attempt to resolve the grievance via teleconference on May 31, 2017. [Vol. 3: 47:23-48:1]  Thus, it is not surprising that UX 11 contains multiple entries for outstanding dues that fall into this category.  For example, UX 11 lists ████████████ a former CMS employee, as owing dues from February 2016 – approximately six months before HMS even acquired the CMS leases, let alone completed onboarding the employees who transferred over.[23]

Moreover, these occurrences are not limited to active HMS employees.  For example, EX 3 (the Company's damages analysis) includes a list of terminated employees with outstanding dues that the Union seeks a remedy for in this proceeding.  However, this list *also* contains entries for outstanding dues for former CMS employees that *predate* the Company's acquisition of CMS leases.  For example, EX 3, "Issue 1," former CMS employee ██████████ owes dues from February 2016.[24]  This is consistent with the fact that the Union also sought retroactive deduction for former CMS employees who never transitioned to HMS in October 2016. [*See* UX 15 at 1 ("[i]n addition, the below were on the list but are not active employees or are not union associates.")]

The Company cannot be held legally responsible for these dues because it did not employ the workers at that time and did not have dues authorization cards for them.  Indeed, if the Company was compelled to pay those amounts to the Union, it would amount to a violation of the Labor Management Relations Act. *See* 29 U.S.C. 186(c)(4).  The Union presented no testimony to explain why the Company should be responsible for these entries and has failed to satisfy its burden in this regard.

## ii.  **The Company Complied with Section 2.7 of the Agreement and Cannot Be Held Responsible for Employees Who Never Signed An Authorization Form.**

One of the Union's central claims is that the Company violated Section 2.7 of the Agreement by failing to "provide, assist in in the completion of, and remit" dues authorization forms.  This claim fails

---

[23] This example is not exhaustive of these particular occurrences.  Please note that UX 11 is not paginated, however, the names are listed in alphabetical order.
[24] We refer to EX 3 instead of UX 20 because it is in alphabetical order and easier to sort through.

38

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-91**

1   because the Union has presented no credible evidence to indicate that the Company violated its obligations

2   and as a result, <u>if neither party has a record of a signed authorization card for a particular employee, the</u>

3   <u>Company cannot be held responsible for those claims.</u>

4         In order to assess the merits of this claim, it is necessary to review the evidence associated with

5   each relevant phrase in Section 2.7, *i.e.*, "provide," "assist in the completion of," and "remit."

6                1.  *The Company "Provided" Employees with UX 1*

7         The Union asserts that the Company has failed to *provide* the employees in question with UX 1.

8   The only employee who testified on behalf of the Union, Hernandez, could not even recall what forms she

9   filled out during her orientation, let alone whether she received UX 1.  [Vol. 2: 191:5-7]  The remainder

10  of the Union's evidence was presented through Simmons' testimony and emails,[25] spreadsheets,[26] various

11  employee declarations,[27] as well as UX 21, the dues authorization card of ▮▮▮▮▮▮▮▮.  However,

12  none of this evidence supports the assertion that the Company *failed to provide* the employees with UX 1

13  because the evidence presented by the Union was limited to whether the Company *failed to deduct dues*

14  for employees who had authorized it to do so.  [*See, e.g.,* UX 5 at 5 ("I viewed this employee's record and

15  saw no issue with his hire record in PeopleSoft…"); UX 17]

16        On the contrary, the Union <u>stipulated</u> that its organizers <u>never</u> even attended the Company's

17  orientation sessions where UX 1 was passed out, the Union's organizers (Sotto and Valdivia) testified that

18  they *never* instructed any other union staff to attend orientation sessions, and Valdivia did not even know

19  that UX was included in the new hire packet before 2016.  [JX 6; Vol. 2: 96:5-8, 112:12-19; Vol. 3:

20  119:23-120:5, 122:6-11]  Thus, despite having the burden of proof, the Union has not presented any

21  evidence to establish that the Company did not "provide" UX 1 to the employees at issue.

22        The Company, on the other hand, presented credible testimony through Preston about its process

23  for providing employees with copies of UX 1 during the first day of orientation.  [Vol. 5: 6:20-24, 48:20-

24  49:7]  This evidence has not been contradicted.

---

25         [25] *See* UX 5- 9, 11, 14-17, 19.

26         [26] *See* UX 3, 12 20, 24, 27.

         [27] The Company's evidentiary objections for these documents was sustained and the documents were received by the

27  Arbitrator <u>but not for the purposes of establishing that the employees in question actually filled out and signed an authorization</u>

        <u>form.</u>  [Vol. 1: 83:19-22, 86:20-87:19, 95:12-96:9, 97:12-17]  Nonetheless, each of these declarations either indicate that the

28  employee in question either *received UX 1 or could not recall receiving it.*

39

**Exhibit 3**
**3-92**

2.   *The Company "Assisted in the Completion" of UX 1*

The Union's assertion that the Company has failed to "assist" in the completion of UX 1 falls victim to a similar analysis.  Indeed, as explained in Section VII.ii.1, *supra*, the Union offered no credible evidence concerning what actually took place at each orientation meeting – other than confirming that the Company actually provided UX 1 to the employees, and stipulating that its organizers *never attended orientation sessions*.  Thus, the Union has failed to carry its burden of proof in this regard as well.

However, the evidence offered by the Company in connection with this specific phrase is vital because the Company's conduct comports with the ordinary and accepted meaning of the term.   The term "assist" is undefined in the Agreement and neither of the parties offered any evidence concerning its bargaining history and therefore, the ordinary and popularly accepting meaning of the term controls. *Quadcom 9-1-1-Pub. Safety Communications Sys.*, 113 LA 987, 991-92 (Goldstein 1999).  Consequently, in the absence of such evidence, the party whose understanding is in accord with the ordinary meaning of that language is entitled to prevail.  *Gulf Printing Co.*, 92 LA 893, 895 (King 1989); *see also* Elkouri & Elkouri, How Arbitration Works, 9-21 (7th Ed. 2012).

In this case, the Company's understanding of the term is consistent with the Oxford Dictionary's definition of the term "assist," *i.e.*, "[h]elp (someone), typically by doing a share of the work."  English Oxford Living Dictionaries, *Definition of "assist" in English*, https://oxfordenglishdictionaries.com/definition/assist (last visited October 9, 2018).   The Company presented evidence that it provided the form to employees and briefly described the nature of it.  [Vol. 1: 142:22-143:3, Vol. 5: 24:17-25:3]

This comports with "doing a share of the work."  In fact, the Union has conceded that the Company *does not have a legal obligation to force* a new hire to execute the Union authorization form.  [JX 6]  This concession is consistent with the NLRB precedent.  *See, e.g., Bayly Manufacturing Company* (1953) 103 NLRB 1337 (finding the company violated the NLRA by requiring employees to sign a dues authorization form as a condition of employment).  This begs the question – what more can the Company do to "assist," other than provide the new hires with UX 1 and explain what it is?  The answer: nothing.

40

**Exhibit 3**
**3-93**

1    To find otherwise would be inconsistent with the NLRB precedent, as well as the ordinary and

2  accepted meaning of the term "assist." "Assisting" means to do a "share" of the work. In the present case

3  the Company does its part, but the evidence plainly indicates that the Union does not reciprocate because

4  it does not attend new hire orientations and has no process for introducing itself to new employees because

5  it is "too much work." [Vol. 1: 103:14-21] This likely explains why certain employees have refused to

6  fill out UX 1 – an occurrence that the Union concedes having knowledge about through the Company's

7  representatives. [Vol. 1: 82:3-12; Vol. 2: 146:23-147:7, 147:23-148:1; Vol. 3: 38:15-17]

8    3.   *The Company "Remitted" all Completed Forms of UX 1 in Its Possession*

9    *During the Relevant Period*

10    The final portion of the Union's claim under Article 2.7, *i.e.*, the Company has failed to "remit"

11  UX 1, also fails because the Union did not competently establish a violation by a preponderance of the

12  evidence.

13    Again, the majority of the Union's testimony concerned the Company's alleged failure to deduct

14  dues for employees who had executed authorization forms. Thus, the Union presented no testimony from

15  any of its witnesses concerning this alleged violation, *i.e.*, instances in which the Union was <u>missing</u> dues

16  authorization forms because the Company failed to send them to the Union. Nonetheless, even if such

17  testimony was presented by the Union, it would not be entitled to any weight due to the Union's defective

18  recordkeeping process. Indeed, the Union conceded that it <u>only recently started scanning authorization</u>

19  <u>forms into the TIMMS system – when it has *time* -  and authorization cards received prior to that point are</u>

20  <u>either in storage or located in another Union office altogether.</u> [Vol. 2: 24:22-25:11] This further weakens

21  the Union's claim because there is a strong likelihood that the Union is not missing any completed dues

22  authorization forms because it has done a poor job keeping track of them and, as such, its system is not

23  up to date.

24    The only documentary evidence offered by the Union which purports to establish this violation is

25  UX 10. However, the Arbitrator sustained the Company's objections to that exhibit and <u>did not receive it</u>

26

27

28

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-94**

1  for the purpose of establishing that the employees who signed declarations had in fact completed UX 1.

2  Thus, the record is also devoid of any documentary evidence in support of this claim.[28]

3      The Company presented evidence to fill in the blanks left by the Union.  Preston testified that the

4  Company sends completed authorization forms on a monthly basis, if not more frequently due to mass

5  requirement in preparation for peak season.  [Vol. 2: 144:14-145:9]  This testimony was not contradicted

6  by the Union – in fact – the Union stipulated that the Company "periodically" sends the completed forms.

7  [JX 6]

8      iii.   **Article 2.12 Does Not Relieve "Employees" Who Provided the Company with**

9            **Signed Authorization Forms of Their Obligation to Remain in Good Standing.**

10          1.   **The Union's Interpretation of Article 2.12 is Incapable of Harmonizing the**

11              **Remaining Provisions Contained in Article 2 and Leads to Absurd Results.**

12      The Union's blanket claim that only the Company is personally liable for outstanding dues

13  deductions related to employees (active or terminated) who signed authorization forms and submitted

14  them to HMS, hinges on the following language:

15          2.12. ...If an Employer has agreed to the deduction of dues pursuant to this
        Article and **fails to collect or pay over such dues** pursuant to this Article,

16          the Employer shall be liable for regular dues and initiation fees which the
        Union **loses** by reason of the Employer's failure.  **This provision does not**

17          **affect the obligations of the employees under this Article.**   [JX 1]
        (emphasis added)

18      The Union's interpretation fails for three reasons: (1) it ignores the final sentence in Article 2.12;

19  (2) it disregards the defined term, "employee" in Article 1.1; and (3) it fails to apply the ordinary and

20  accepted meaning of the term "loses" in Article 2.12.  [*Id.*]  In light of the Union overlooking these terms,

21  each of which is referenced in Article 2, its interpretation fails to harmonize the remaining provisions

22  contained therein and must be rejected. *Fire Fighters (IAFF)*, 112 LA 663 (Lubic, 1999) (in evaluating

23  competing interpretations, the inclination is to choose the interpretation that would give effect to all

24  provisions).

25

26

27

28

---

[28] UX 16 – 17 are emails between Simmons and the Company where she attaches copies of signed authorization forms. However, there was no testimony offered indicating that the Company failed to send these forms to the Union.

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-95**

Giving effect to each of the provisions referenced above, the relevant portion of Section 2.12 must be interpreted in the following limited sense: (1) outstanding dues owed by <u>active</u> employees *can only be recovered directly from the Company* in the event those funds are "lost" because the Company <u>refuses</u> to deduct arears from the employees; and (2) outstanding dues owed by <u>terminated</u> <u>employees</u> cannot be recovered directly from the Company because they are no longer <u>"employees"</u> as defined under Article 1.1, <u>unless</u> those same funds were "lost" while the employees were still working for the Company.  We explain each of these provisos in turn.

The first proviso is established by focusing on the final sentence of Article 2.12, *i.e.*, <u>that it does not affect the remaining obligations of the employees under the Article.</u>  This includes the obligation of both new and present employees to "become and remain members in good standing" under Articles 2.2 and 2.3.  Thus, in order to give effect to all three of these provisions, the Union must have the *option* of recovering outstanding dues from employees (either directly or through an arrears deduction by the Company).  The Union's other option, *i.e.*, to recover outstanding dues of "employees" directly from the Company, <u>only becomes available when the Union "loses" the funds in question due to the Company's failure.</u>

This begs the question – when does the Union "lose" the outstanding funds due to the Company's actions.  This term is not defined in the Agreement, however, the Oxford Dictionary's definition of "lose" is "to be deprived of or cease to have or retain (something)."  *English Oxford Living Dictionaries, Definition of "lose" in English*, https://oxfordenglishdictionaries.com/definition/lose (last visited October 9, 2018).  Applying the ordinary accepted meaning of this term, the Union can only exercise this option when the Company *refuses* to assist in the collection of dues owed by "employees" – thus "depriving" the Union of its money.

Stated differently: the Union cannot said to be "deprived" from obtaining these funds if the Company presents it with an opportunity to deduct any dues arrears.  Absent these circumstances, the "employees" still have an obligation remain in good standing and the Company is not directly liable.  To interpret the provision otherwise would be to ignore Articles 2.2 and 2.3.

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-96**

1    The second proviso turns upon the definition of the term "employee" in Article 1.1, *i.e.*, "all of the
2    Employer's employees at the Los Angeles International Airport within the jurisdiction of the
3    Union…except as modified by the express terms of this Agreement." [JX 1] (emphasis added)  This term
4    is utilized throughout Article 2,[29] most importantly under Subsection D, "Union Dues Authorization,"
5    Article 2.10, "[t]he Employer agrees to deduct Union initiation fees and monthly dues from employees'
6    earnings as required." [*Id.*] (emphasis added)  It is not possible to read Article 2.12 *without reference* to
7    2.10 because it creates the very obligation, *i.e.*, dues deduction, which is the subject of Article 2.12.  Since
8    the term "employees" has not been modified by this article,[30] it can only be interpreted as referring to
9    individuals who fit that definition and are currently working at LAX.  To interpret the provision otherwise
10   would add language to the Agreement that is nonexistent.

11   Despite having the burden of proof the record is devoid of any evidence that the above-referenced
12   interpretation was not intended by the parties, or is otherwise contrary to past practice.  In fact, the parties'
13   practice confirms the above-referenced interpretation because dues arrears adjustments were agreed to in
14   October 2016 for active employees.  *See* Section VI.5., *supra*.

15   The Union's interpretation not only ignores these provisions, it also leads to absurd results for four
16   reasons.  *Quadcom 9-1-1-Pub. Safety Communications Sys.*, 113 LA at 992 (when one interpretation of a
17   contract would lead to harsh, absurd or nonsensical results, while an alternative interpretation, equally
18   plausible, would lead to just and reasonable results, the alternative interpretation will be used).

19   First, it transforms the Company from a "mere conduit through which dues pass from the employee
20   to the Union," into an insurer that becomes personally liable for any dues deductions errors.  This is simply
21   outside the accepted policy behind dues check-off.  *Texas Utilities Generating Co.*, 85 LA 814, 816
22   (Caraway 1985).

23   Second, out of fear of personal liability, it forces the Company to expend significant resources and
24   time reviewing the Union's inaccurate "Missing Payment Reports" that are the generated from an
25   inherently flawed and redundant process which utilizes an antiquated computer system with no checks

26
27   [29] *See, e.g.*, Articles 2.1-2.3, 2.5, 2.9, 2.10, 2.13, 2.15, 2.17, 2.18.  [JX 1]
     [30] Article 1.1 permits the parties to amend modify the definition of "employee" pursuant to the express terms of the
28   Agreement.

44

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-97**

and balances in place.  *See* Section VI.1.d-e, *supra* (the Union's defective methods for keeping track of new hires); Section VI.2.b, *supra*, (Simmons and Martínez's testimony regarding the generation of "Missing Payment Reports"); Section VI.8., *supra* (the Company's analysis of the multiple flaws associated with the Union's data)  This also defies the generally accepted rationale regarding dues check-off.  *See Texas Utilities Generating Co.*, 85 LA at 816 ("[t]he Company receives no benefit from deducting and remitting the dues to the Union.  While minimal administrative expense may be assumed by the Company…it is inconsistent with the basis of a dues check-off procedure to impose upon the company a heavy expense and time burden.")

Third, the Union's interpretation depreciates the value of the union security clause in the Agreement.  Union security is a contractual right that is typically bargained for in exchange for a no-strike clause.  The Company loses its share of the bargain if the Union's analysis is accepted.  Moreover accepting the Union's interpretation fails to give effect to the union security clause because the Union has little incentive, if any, to enforce it.  *Fire Fighters (IAFF)*, 112 LA 663.  This is a practical reality as the Union has admitted that it does not enforce the Agreement's union security clause.  *See* Section VI.2.d., *supra*.  Moreover, the mere existence of the union security clause further supports the Company's interpretation because it supports the notion of multiple *options* for recovering unpaid dues – each of which comes within its own perquisites and conditions for enforcement.

Last, if a Company can be hold personally liable for dues errors, an employee has absolutely zero incentive to ensure his deductions are being made.  This is exacerbated by the practical realities of the Company's industry which engages in mass hiring during peak season and experiences very frequent turnover.  Indeed, as testified by Preston, seasonal employees often quit without even telling their supervisor.  [Vol. 2: 180:19-181:2]  This further incentives those employees to refrain from checking their paystubs to see if dues check-off is being administered.[31]

---

[31] This is already a problem.  As Martinez testified that she was not looking at her paystub to see if dues were being deducted.  [Vol. 2: 192:10-12]

45

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-98**

**2.  The Company's Interpretation Dictates That It Is Not Personally Liable for the Outstanding Dues of Both Active and Terminated Employees.**

Applying the Company's interpretation of Article 2.12 as described in the prior section of this brief, it <u>cannot</u> be held liable for the allegedly outstanding dues deductions that are the subject of this arbitration.

Concerning active employees, the Company offered to resolve those arrears via retroactive deductions on multiple occasions during the grievance process <u>and the Union refused.</u> *See* Section VI.6.b., *supra.* As such, those outstanding dues are not "lost" within the meaning of Section 2.12 and the Company is not personally responsible.

The claim for terminated employees who are no longer working for HMS is similarly defective. There is no evidence in the record that the Company *refused* to deduct arrears for those employees <u>while they were still employed by the Company.</u>  Therefore, since those individuals are no longer "employees" within the meaning of Article 1.1, the Union's claim fails.

**iv.  <u>Assuming Article 2.12 is Ambiguous, the Union's Claim Still Fails Because Past Practice Dictates that the Company Should Not Be Personally Liable.</u>**

In order for past practice to be binding on both parties, it must be (1) unequivocal; (2) clearly enunciated and acted upon; and (3) readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both parties. *Burroughs Corp. of Am.*, 120 LA 1247, 1252 (McDonald 2004); *Celanese Corp. of Am.*, 24 LA 168, 172 (Justin 1954); *see also* Elkouri & Elkouri, *supra*, 12-4. Even if Article 12.6 is determined to be ambiguous, the parties' past practice of retroactive dues deductions for active employees is binding because HMS can competently establish each element of past practice.

In the present case there is clear evidence that approximately two months of dues arrears were resolved by the parties' in October 2016 for former employees of CMS who had transitioned to HMS. *See* Section VI.5, *supra.* The issue was resolved via retroactive dues deductions implemented by the Company. However, the retroactive dues were only deducted for <u>current employees</u> of the Company, as Preston made it clear that forty-four of those employees were no longer active employees and the Union would not be receiving money for them. [UX 15] The transaction was implemented later that same month.

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-99**

1    This practice is not isolated.  Donohoe testified that the Company typically works collaboratively

2  with any union when these types of disputes arise and makes a mutual arrangement for the deduction of

3  dues arrears.   This includes the Company's relationship with UNITE HERE! as well as Local 11,

4  specifically.  [Vol. 3: 40:3-11, 41:2-9, 41:11-20].

5    This practice has also been accepted by the parties.  As explained above, the parties' mutually

6  agreed to deduct outstanding dues in October 2016 for active employees.  Additionally, the Union failed

7  to raise any issues concerning the subject of dues, dues checkoff or union security during the parties'

8  negotiation of the CBA that covers the instant grievance. *See* Section VI.3, *supra*.  Furthermore, from the

9  time transaction took place in October 2016 until the filing of the instant grievance, the Union made no

10  effort whatsoever to challenge it.

11    In light of the above the parties' prior dealings meet the criteria necessary to establish a binding

12  past practice as to <u>active employees with dues arrears.</u>  The Union, despite having the burden of proof,

13  has failed to proffer any competent evidence to challenge or otherwise contradict this practice.  Therefore,

14  the Company cannot be held <u>personally liable</u> for the dues arrears associated with active employees.

15    With respect to terminated employees, the end result is the same.  Even if one assumes that Article

16  2.12 is ambiguous because it makes no reference to former and/or terminated employees,[32] the record is

17  absent of any evidence capable of establishing a binding past practice that the Company is <u>personally</u>

18  <u>liable</u> for those dues.  Therefore, the Union has failed to sustain its burden of proof on this specific issue

19  and it fails.  Sustaining the Union's interpretation violates Article 11.8 because it would add language to

20  the Agreement and render any award irrational.

21    5.    **<u>The Union's Claim That The Grievance Should Be Sustained Because the Company</u>**

22      **<u>Allegedly Failed to Provide a Written Response at Step 2 is Absurd and, If Accepted,</u>**

23      **<u>Would Amount to a Forfeiture.</u>**

24    The Union may argue that the Company's failure to provide a <u>written</u> response at Step 2 merits

25  sustaining the grievance.  This argument must be rejected out of hand.

26

27

28

---

[32] This conclusion is impossible to avoid because Article 1.1, which provides the definition of "employees," provides the parties' with an opportunity to amend the definition where necessary in the Agreement.

47

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3
3-100**

1   While the Company concedes it did not provide a formal written response to the grievance pursuant

2   to Article 10.2, it had multiple informal discussions with the Union concerning its merits via email and

3   teleconference both before and after it was filed, as well as after the demand for arbitration was made. *See*

4   Section VI.6., *supra*.   Indeed, Donohoe clearly articulated the Company's position that it was not

5   personally liable for the outstanding dues in question.   *See* Section VI.6.b. (detailing Donohoe's

6   teleconferences with Union representatives).

7   This is not a scenario where the Company refused to respond to the grievance at all.   The mere

8   fact that the Company did not formally put its position in writing should not result in the grievance being

9   sustained, as that would amount to a massive forfeiture and significantly prejudice the Company due to a

10  technicality.  The Union, on the other hand, suffered absolutely no prejudice from the Company's decision

11  to verbalize its position instead of putting it in writing.  The Union disputed the Company's position during

12  each of the teleconferences referenced above and ultimately filed a demand for arbitration.  Therefore, the

13  Union's argument must fail.

14  **VIII.   CONCLUSION:**

15  For the reasons set forth above, it is respectfully requested that the Union's grievance be denied in

16  its entirety.

17

18  Respectfully submitted,

19  JACKSON LEWIS P.C.

20

21  Date: October 29, 2018

22  Lawrence H. Stone
    Steven M. Zimmerman

23  Attorneys for HOST INTERNATIONAL INC.

24

25

26

27

28

48

POST-HEARING BRIEF ON BEHALF OF HOST INTERNATIONAL INC. TO DENY THE GRIEVANCE FILED BY
ALL AFFECTED EMPLOYEES OF THE UNION REGARDING DUES DEDUCTIONS

**Exhibit 3**
**3-101**

# Exhibit 4

Exhibit 4
4-102

## McCRACKEN, STEMERMAN & HOLSBERRY, LLP

### Counselors and Attorneys at Law

595 Market Street, Suite 800
San Francisco, CA 94105
415.597.7200
Fax 415.597.7201

Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
John J. Davis (CA)
Florence E. Culp (CA, NV)
Kristin L. Martin (CA, NV, HI)
Eric B. Myers (CA, NV)
Paul L. More (CA, NV, MA)
Sarah Varela (CA, AZ, NV)
Sarah Grossman-Swenson (CA, NV)
Yuval Miller (CA, NV)
David L. Barber (CA, NV)
Kimberley C. Weber (CA, NV)
A. Mirella Nieto (CA)
F. Benjamin Kowalczyk (CA)

Robert P. Cowell (1931-1980)

Philip Paul Bowe (CA) (Ret.)
Barry S. Jellison (CA) (Ret.)

1630 Commerce Street, Suite A-1
Las Vegas, NV 89102
702.386.5107
Fax 702.386.9848

December 26, 2018

***Via Electronic Mail and U.S. Mail***

Lawrence H. Stone
Jackson Lewis P.C.
725 South Figueroa Street, Suite 2500
Los Angeles, CA 90017

   Re: UNITE HERE Local 11 & HMS Host (Arbitration Award)

Dear Larry:

   Happy Holidays.  We received the enclosed award for Arbitrator Prihar on December 6, 2018.  The award gives Host 45 days, or until January 20, 2019 to make payment to Local 11.  Please let me know how the funds will be transmitted.

   Thank you.

         Sincerely,

         Kristin L. Martin

CC: Martin Lopez

**Exhibit 4**
**4-103**

# Exhibit 5

Exhibit 5
5-104

## McCRACKEN, STEMERMAN & HOLSBERRY, LLP

### Counselors and Attorneys at Law

January 18, 2019

595 Market Street, Suite 800
San Francisco, CA  94105
415.597.7200
Fax 415.597.7201

Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
John J. Davis (CA)
Florence E. Culp (CA, NV)
Kristin L. Martin (CA, NV, HI)
Eric B. Myers (CA, NV)
Paul L. More (CA, NV, MA)
Sarah Varela (CA, AZ, NV)
Sarah Grossman-Swenson (CA, NV)
Yuval Miller (CA, NV)
David L. Barber (CA, NV)
Kimberley C. Weber (CA, NV)
A. Mirella Nieto (CA)
F. Benjamin Kowalczyk (CA)

Robert P. Cowell (1931-1980)

Philip Paul Bowe (CA) (Ret.)
Barry S. Jellison (CA) (Ret.)

***Via Electronic Mail***

Guy Z Prihar APC
P.O. Box 642572
Los Angeles, CA 90064

     Re: HMS Host at LAX & UNITE HERE Local 11

Dear Arbitrator Prihar:

     This letter concerns compliance with your award dated December 6, 2019. The award requires the Employer to comply with it within 45 days from issuance of the award, which is January 20, 2019.  On December 26, 2018, my assistant sent a letter from me to opposing counsel by email and by U.S. mail, in which I asked about plans for compliance.  To date I have not received a response.

     You have retained jurisdiction over interpretation, administration and implementation of the remedy, and stated that either party may invoke your jurisdiction by written request for sixty days after issuance of the award, which is February 4, 2019.  By this letter, I invoke your jurisdiction, and ask that you direct the Employer to state its intentions with respect to compliance with the award.

     Thank you for your attention.

Sincerely,

Kristin L. Martin

1630 Commerce Street, Suite A-1
Las Vegas, NV  89102
702.386.5107
Fax 702.386.9848

Cc:   Larry Stone
      Martin Lopez

**Exhibit 5**
**5-105**

# Exhibit 6

Exhibit 6
6-106



Representing Management Exclusively in Workplace Law and Related Litigation

**Attorneys at Law**

| | | | |
|---|---|---|---|
| Jackson Lewis P.C. | ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| 725 South Figueroa Street | ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| Suite 2500 | ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| Los Angeles, California 90017 | AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| Tel 213 689-0404 | BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| Fax 213 689-0430 | BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| www.jacksonlewis.com | BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| | CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| | CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| | CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| | DALLAS, TX | MEMPHIS, TN | PITTSBURGH, PA | STAMFORD, CT |
| | DAYTON, OH | MIAMI, FL | PORTLAND, OR | TAMPA, FL |
| | DENVER, CO | MILWAUKEE, WI | PORTSMOUTH, NH | WASHINGTON, DC REGION |
| | DETROIT, MI | MINNEAPOLIS, MN | PROVIDENCE, RI | WHITE PLAINS, NY |
| | GRAND RAPIDS, MI | | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

January 28, 2019

**VIA EMAIL** gzp.adr@gmail.com

Guy Z. Prihar
Arbitrator
P.O. Box 812081
Los Angeles, CA 90081

      Re:    Host International, Inc. and Unite Here, Local 11
               LAX Union Dues
               FMCS Case No. 170427-53773-A

Dear Mr. Prihar,

      Below you will find, in summary fashion, the objections of Host International, Inc. to the Award, and the remedies set forth, issued by you on December 6, 2018 in the matter of the LAX Union Dues. The below summary is not meant to be an exhaustive legal analysis of the Award, but a summary of the Employer's positon.

<u>**AWARD**</u>

1. The Parties' respective arbitrability arguments are denied, and the grievance is procedurally arbitrable on the merits.

2. The Employer violated the Collective Bargaining Agreement in the manner it deducted Union initiation fees and monthly dues from employees' earnings for the period beginning on February 1, 2016.

***OBJECTION:*** *To the extent this portion of the Award encompasses any of the below-referenced provisions of the Award to which HMS has asserted objections, HMS incorporates those objections here for the same reasons stated therein. Further, no audit has been completed which*

**Exhibit 6**
**6-107**

**jackson⎮lewis.**

*encompasses the scope of the Award.  Thus, any potential damages are unknown to the parties at this time.*

3.   The remedy is remanded to the parties under the following conditions:

a.   The scope of the remedy covers the time period of February 1, 2016 to the date of the issuance of the Award.

**OBJECTION:**  *The Arbitrator exceeded his authority by providing a remedy in the Award which is beyond the scope of the grievance and beyond the time limits agreed upon by the parties.  See JX 1 and JX 5.  Further, the Award ignores the burden of proof in a contract interpretation case. Barring any contract language to the contrary, when a union claims an employer violates a provision of the contract, it bears the burden of proving the contract violation with a preponderance of the evidence.  The Union did not present any credible evidence concerning specific contract violations that have taken place beyond the dates listed in EX 3.*

b.   The remedy is derived only from those employees covered by the CBA for initiation fees, reinstatement fees, and monthly dues deductions not made during their employment with the Employer.  The remedy shall not be derived from those employees during times, if any, in which they had no net wages from which to deduct dues.

c.   Of the employees identified in (b) above, the scope of the remedy is derived only from those who signed a dues check-off authorization as related to employment for the Employer, beginning either on February 1, 2016 (or August 20, 2015, in the case of a former CMS employee) or on the date on which the employee signed the dues check-off authorization as related to employment for the Employer, whichever is later.  For any former CMS employee for whom a dues check-off card cannot be produced, the employee will be presumed to have signed the dues check –off as of the date of hire unless the Employer can demonstrate either that it presented the employee with a dues card and the employee refused to authorized dues check-off or that the former CMS employee never authorized dues check-off while employed at CMS.

**OBJECTION:**  *This section of the Award, and its remedy, is unlawful in that relies on contractual language that violates the LMRA and is repugnant to the National Labor Relations Act.  The Arbitrator exceeded his authority and the Award is irrational since the Award adds terms to the CBA that do not exist and were not negotiated between the parties, effectively rewriting the CBA.  The Award is also irrational in that it ignores a stipulation reached between the parties during the course of the Arbitration which further explains and governs the contract*

**Exhibit 6
6-108**

**jackson|lewis**

Arbitrator Guy Z. Prihar<br>
Re:  Host International Inc and Unite Here, Local 11<br>
January 28, 2019<br>
Page 3

*language.  Further, the Award ignores the burden of proof in a contract interpretation case.
Barring any contract language to the contrary, when a union claims an employer violates a
provision of the contract, it bears the burden of proving the contract violation with a
preponderance of the evidence.  The Union did not present any credible evidence supporting an
interpretation that the "the employee will be presumed to have signed the dues check–off as of
the date of hire unless the Employer can demonstrate either that it presented the employee with a
dues card and the employee refused to authorized dues check-off or that the former CMS
employee never authorized dues check-off while employed at CMS."*

      d.  Notwithstanding (c) above, the Employer shall pay the Union the dues and fees
owed by any employee from whose September 2016, or October 2016 wages the
employer deducted September 2016 or October 2016 dues, as reflected on UX
12(b), but thereafter failed to continue deducting dues.

**OBJECTION**: *HMS agrees with the above, <u>so long as the employee in question is still employed
by the Company and there is a record of a signed authorization form for that particular
employee</u>.*

      e.  For any other bargaining unit member employed during the time fame defined by
the scope of this remedy, who is not a former CMS employee and for whom a
dues check-off cannot be located, and where the employer has failed to deduct
dues on behalf of that bargaining unit member, the Employer shall pay the Union
the dues and fees owed.  The amount owed and paid shall be based on a date no
earlier than February 1, 2016 or the date of hire of that bargaining unit member,
whichever is later, unless the employer can establish that: (1) it presented the
bargaining unit member with a dues card; (2) the bargiainng unit member refused
automatic payroll deduction; and (3) the Employer provided the Union with its
copy of that card with that information.

**OBJECTION:** *This section of the Award, and its remedy, is unlawful in that relies on
contractual language that violates the LMRA and is repugnant to the National Labor Relations
Act.  The Arbitrator exceeded his authority and the Award is irrational since the Award adds
terms to the CBA that do not exist and were not negotiated between the parties, effectively
rewriting the CBA.  The Award is also irrational in that it ignores a stipulation reached between
the parties during the course of the Arbitration which further explains and governs the contract
language.  Further, the Award ignores the burden of proof in a contract interpretation case.
Barring any contract language to the contrary, when a union claims an employer violates a
provision of the contract, it bears the burden of proving the contract violation with a
preponderance of the evidence.  The Union did not present any credible evidence supporting an
interpretation that the "the employee will be presumed to have signed the dues check–off as of*

**Exhibit 6**<br>
**6-109**

**jackson|lewis.**

Arbitrator Guy Z. Prihar
Re: Host International Inc and Unite Here, Local 11
January 28, 2019
Page 4

*the date of hire unless the Employer can demonstrate either that it presented the employee with a dues card and the employee refused to authorized dues check-off or that the former CMS employee never authorized dues check-off while employed at CMS."*

    f.  To establish any additional employees covered by the scope of the remedy, the Employer shall present pursuant to JX5 and UX 23 and no later than thirty days after the issuance of the Award, any dues check-off it has in its possession. The Union may present any additional dues check-off it has in its possession. The Parties shall assist each other in identifying any employees covered by the scope of this remedy.

    g.  The Employer shall not attempt to recoup any money owed to the Union pursuant to this remedy from the bargaining unit members, such as by making retroactive deductions, for example.

**OBJECTION:** *This section of the Award, and its remedy, is unlawful in that relies on contractual language that violates the LMRA and is repugnant to the National Labor Relations Act. The Arbitrator exceeded his authority and the Award is irrational since the Award adds terms to the CBA that do not exist and were not negotiated between the parties, effectively rewriting the CBA. The Award is also irrational in that it ignores a stipulation reached between the parties during the course of the Arbitration which further explains and governs the contract language. Further, the Award ignores the burden of proof in a contract interpretation case. Barring any contract language to the contrary, when a union claims an employer violates a provision of the contract, it bears the burden of proving the contract violation with a preponderance of the evidence. The Union did not present any credible evidence supporting an interpretation that the "the employee will be presumed to have signed the dues check–off as of the date of hire unless the Employer can demonstrate either that it presented the employee with a dues card and the employee refused to authorized dues check-off or that the former CMS employee never authorized dues check-off while employed at CMS." The Award also ignores the well the established past practice of the parties concerning retroactive deductions.*

    h.  The Employer is not liable for pre-Award interest.

    i.  The Employer has forty-five calendar days from the date of issuance of this Award to comply with the remedy of this Award, after which post-Award interest on all outstanding sums at the federal rate will apply.

    j.  The Employer's liability, including that pertaining to post-Award interest liability, continues until it has fully complied with the payment of all sums owed to the

**Exhibit 6**
**6-110**

**jacksonlewis**.

Arbitrator Guy Z. Prihar<br>
Re:  Host International Inc and Unite Here, Local 11<br>
January 28, 2019<br>
Page 5

Union and begins deducting dues from those employees covered by the scope of the remedy.

    k.   The Employer shall cease and desist from violating Article 2 of the CBA.

**OBJECTION:** *To the extent this portion of the Award encompasses any of the above-referenced provisions of the award to which HMS has asserted objections, HMS incorporates those objections here for the same reasons stated therein.*

                        Very truly  yours,

                        JACKSON LEWIS PC

                        Larry H. Stone<br>
                        Steven M. Zimmerman

cc:    Kristin L. Martin, Esq. (via email klm@mshlaw.com)

4849-4317-6070, v. 1

**Exhibit 6**<br>
**6-111**